309 F.3d 551
 The BANK OF AMERICA; Wells Fargo Bank N.A.; California Bankers Association, Plaintiffs-Appellees, and
California Federal Bank, Plaintiff-Intervenor-Appellee,
v.
CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants, and
City of Santa Monica; Pamela O'Connor, Mayor of the City of Santa Monica; Ken Genser, Mayor Pro Tempore of the City of Santa Monica; Richard
Bloom, Council Member; Michael A. Feinstein, Council Member; Robert T. Holbrook; Kevin McKeown, Council Member; Paul Rosenstein, Council Member; Marsha Jones Moutrie, City Attorney, Defendants-Appellants.
The Bank of America; Wells Fargo Bank N.A.; California Bankers Association, Plaintiffs-Appellees, and
California Federal Bank, Plaintiff-Intervenor-Appellee,
v.
City and County of San Francisco; Willie Brown, Mayor of the City of San Francisco; Tom Ammiano, President, Board of Supervisors; Alicia Becerril, Sue Bierman, Amos Brown; Leslie Katz; Barbara Kaufman, Mark Leno; Gavin Newsom, Mabel Teng; Michael Yaki; Leland Yee; Supervisors; Louise H. Renne, City Attorney, Defendants-Appellants.
 No. 00-16355.
 No. 00-16394.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 17, 2002.
 Filed October 25, 2002.
 As Amended on Denial of Rehearing and Rehearing En Banc December 20, 2002.*
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Adam Radinsky, Deputy City Attorney, Santa Monica, CA, for defendant-appellant City of Santa Monica.
 Owen P. Martikan, Deputy City Attorney, San Francisco, CA, for defendants-appellants City and County of San Francisco.
 E. Edward Bruce, Covington & Burling, Washington, DC, for plaintiffs-appellees Bank of America, N.A., and Wells Fargo Bank, N.A.
 Michael J. Kass, Pillsbury Madison & Sutro LLP, San Francisco, CA, for plaintiff-appellee California Bankers Association.
 Kent M. Roger, Brobeck, Phleger & Harrison LLP, San Francisco, CA, for plaintiff-appellee California Federal Bank.
 Thomas J. Segal, Deputy Chief Counsel, Washington, DC, for Amicus Curiae Office of Thrift Supervision.
 Douglas B. Jordan, Special Counsel, Washington, DC, for Amicus Curiae Office of the Comptroller of the Currency.
 Joel S. Jacobs, Deputy Attorney General, Oakland, CA, for Amici Curiae States of California, Minnesota, and Nevada.
 Michael F. Crotty, Deputy General Counsel for Litigation, Washington, DC, for Amicus Curiae American Bankers Association.
 Teresa M. Olle, Sacramento, California, for Amicus Curiae California Public Interest Research Group.
 Deborah J. La Fetra, Sacramento, California, for Amicus Curiae Pacific Legal Foundation.
 Appeal from the United States District Court for the Northern District of California; Vaughn R. Walker, District Judge, Presiding. D.C. No. CV-99-04817-VRW.
 Before: GOODWIN, SNEED and TROTT, Circuit Judges.
 SNEED, Circuit Judge.
 
 
 1
 This appeal arises from the passage of municipal ordinances (the "Ordinances") by the cities of San Francisco and Santa Monica (the "Cities") prohibiting banks from charging ATM fees to non-depositors. Bank of America, Wells Fargo Bank, the California Bankers Association, and subsequently, California Federal Bank, see infra (The "Banks") filed an action against the Cities seeking to invalidate the Ordinances. The district court (1) found that the Ordinances were preempted by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. §§ 1461-1470, and the National Bank Act, 12 U.S.C. § 24 (Seventh); (2) rejected the Cities' argument that the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§ 1693-1693r, permits the Cities to regulate ATM fees as a consumer protection measure; and (3) granted summary judgment in favor of the Banks and entered a permanent injunction prohibiting the Cities from enforcing the Ordinances. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.
 
 BACKGROUND
 
 2
 In October and November of 1999, the cities of Santa Monica and San Francisco enacted virtually identical ordinances prohibiting "financial institutions" from charging ATM fees to non-depositors. The Ordinances define financial institutions as "any bank, savings association, savings bank, credit union, or industrial loan company," and target California's two largest banks, Bank of America and Wells Fargo Bank.
 
 
 3
 These Ordinances are enforced through private rights of action. Under the Ordinances, any consumer who pays an unlawful ATM fee may sue for "actual damages" of not less than $250 plus attorney fees and costs. In addition, punitive damages of up to $5,000 are allowed where the financial institution has engaged in a "pattern of willful violations." The Ordinances also permit consumers and municipal officials to seek injunctive relief.
 
 
 4
 The Banks dispute the validity of the Ordinances and began litigating almost immediately after the Cities enacted the Ordinances. The following is a summary of the parties' allegations and the procedural history.
 
 
 5
 (1) The Cities' Allegations.
 
 
 6
 The Cities allege that ATM fees charged to non-depositors harm consumers. They point out that non-depositors are charged twice for using an ATM.[1] They insist that ATM fees unduly burden the elderly, the disabled, and the poor because of their "lower mobility and [their] relative lack of choice over which ATMs to use."
 
 
 7
 The Cities also allege that ATM fees undermine competition in the local banking industry. The Cities argue that smaller banks and credit unions lose market share to larger banks because depositors seeking to avoid ATM fees transfer their accounts to banks that operate more ATMs in the Cities.
 
 
 8
 (2) The Banks' Allegations.
 
 
 9
 The Banks reject the Cities' characterization of the ATM market. They claim that ATMs are net "cost centers" for banks who on average lose between $8,000 and $11,000 annually per ATM. The Banks also dispute the Cities' contention that ATM fees have led to greater concentration in the local banking industry.
 
 
 10
 Additionally, the Banks argue that their ability to compete is impaired by the Ordinances. The Ordinances' definition of financial institution does not include all ATM operators. For instance, credit card companies are exempt from compliance because the Ordinances' limited definition of financial institution does not include them. This disparate treatment of ATM operators under the Ordinances would put the Banks at a competitive disadvantage.
 
 
 11
 (3) Procedural History.
 
 
 12
 Upon passage of the Ordinances, the Banks, not surprisingly, suspended ATM service to non-depositors. On November 3, 1999, the Banks filed a complaint against the Cities seeking a declaratory judgment that the Ordinances are preempted by the National Bank Act. On November 15, 1999, the district court preliminarily enjoined enforcement of the Ordinances pending resolution of this action. The Ninth Circuit affirmed, holding that the district court did not abuse its discretion in concluding that preliminary injunctive relief was appropriate under the circumstances. Bank of Am. v. City and County of San Francisco, 215 F.3d 1332 (9th Cir.2000).
 
 
 13
 On January 20, 2000, the district court granted California Federal Bank's ("Cal Fed") motion to intervene as a plaintiff in this action. The following day, Cal Fed filed its complaint against the Cities seeking a declaratory judgment that the Ordinances are preempted by the Home Owners' Loan Act as applied to federal savings banks. Subsequently, the parties filed cross-motions for summary judgment.
 
 
 14
 On June 30, 2000, the district court denied the Cities' cross-motion for summary judgment and granted summary judgment in favor of Cal Fed and the Banks. The district court rejected the Cities' claim that the savings clause in the EFTA permits the Cities to regulate ATM fees as a consumer protection measure. It held that the EFTA's anti-preemption provision is specifically limited to the EFTA and does not grant additional authority to the Cities to regulate national banks.
 
 
 15
 The district court found that the HOLA and the Office of Thrift Supervision's ("OTS") regulations occupy the entire field of ATM fees with respect to federal savings banks. It also found that the HOLA and OTS regulations authorize federal savings banks to charge ATM fees. Thus, the district court held that HOLA preempt the Ordinances. The district court also held that the National Bank Act and the regulations of the Office of Comptroller of Currency ("OCC"), which permit nationally chartered banks to charge ATM fees, preempt the Ordinances.
 
 
 16
 Because of these findings, the district court permanently enjoined the Cities from enforcing the Ordinances. The Cities appeal.
 
 STANDARD OF REVIEW
 
 17
 The district court's grant of a permanent injunction is reviewed for an abuse of discretion. Any determination underlying imposition of the injunction is reviewed by the standard that is appropriate to that determination. LaVine v. Blaine Sch. Dist., 257 F.3d 981, 987 (9th Cir.2001), cert. denied, ___ U.S. ___, 122 S.Ct. 2663, 153 L.Ed.2d 837 (2002). The district court's decision regarding preemption is reviewed de novo. Cramer v. Consol. Freightways, Inc., 255 F.3d 683, 689 (9th Cir.2001) (en banc), cert. denied, ___ U.S. ___, 122 S.Ct. 806, 151 L.Ed.2d 692 (2002). Its grant of summary judgment is also reviewed de novo. Orr v. Bank of Am., 285 F.3d 764, 772 (9th Cir.2002).
 
 DISCUSSION
 
 18
 I. Preemption.
 
 
 19
 We find that the Ordinances are preempted by federal law and regulations and thus invalid by reason of the Supremacy Clause of the Constitution.[2] In determining whether a municipal ordinance is preempted by federal law, our sole task is to ascertain the intent of Congress. Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987). Federal law may pre-empt state law in three different ways. First, Congress may preempt state law by so stating in express terms. Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Second, preemption may be inferred when federal regulation in a particular field is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). In such cases of field preemption, the "mere volume and complexity" of federal regulations demonstrate an implicit congressional intent to displace all state law. Geier v. Am. Honda Motor Co., 529 U.S. 861, 884, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (internal quotations and citation omitted). Third, preemption may be implied when state law actually conflicts with federal law. Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).
 
 
 20
 The Cities contend that all preemption analysis begins with the presumption against preemption. This rests on the assumption that Congress did not intend to supplant state law. However, the presumption is "not triggered when the State regulates in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000).
 
 
 21
 Congress has legislated in the field of banking from the days of M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 325-26, 426-27, 4 L.Ed. 579 (1819), creating an extensive federal statutory and regulatory scheme. The history of national banking legislation has been "one of interpreting grants of both enumerated and incidental `powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." Barnett Bank v. Nelson, 517 U.S. 25, 32, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (citations omitted). Indeed, since the passage of the National Bank Act in 1864, the federal presence in banking has been significant. See id. at 32-33, 116 S.Ct. 1103. Similarly, since the passage of the HOLA in 1933, OTS regulations have governed the "powers and operations of every federal savings and loan association from its cradle to its corporate grave." de la Cuesta, 458 U.S. at 145, 102 S.Ct. 3014, quoting People v. Coast Fed. Sav. & Loan Ass'n, 98 F.Supp. 311, 316 (S.D.Cal.1951). This court has recognized that regulation of federal savings associations by the OTS has been so "pervasive as to leave no room for state regulatory control." Conference of Fed. Sav. & Loan Ass'ns v. Stein, 604 F.2d 1256, 1260 (9th Cir.1979), aff'd, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980).
 
 
 22
 State regulation of banking is permissible when it "does not prevent or significantly interfere with the national bank's exercise of its powers." Barnett Bank, 517 U.S. at 33, 116 S.Ct. 1103. Thus, states retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law.[3] Nevertheless, because there has been a "history of significant federal presence" in national banking, the presumption against preemption of state law is inapplicable. Locke, 529 U.S. at 108, 120 S.Ct. 1135; see Barnett Bank, 517 U.S. at 32-33, 116 S.Ct. 1103; Franklin Nat. Bank v. New York, 347 U.S. 373, 375-76, 74 S.Ct. 550, 98 L.Ed. 767 (1954).
 
 
 23
 II. The Home Owners' Loan Act Preempts the Ordinances.
 
 
 24
 A. Historical Context.
 
 
 25
 The Home Owners' Loan Act of 1933 was enacted to restore the public's confidence in savings and loan associations at a time when 40% of home loans were in default. See Stein, 604 F.2d at 1257; see also S.Rep. No. 91, 73d Cong., 1st Sess., 2 (1933); H.R.Rep. No. 55, 73 Cong., 1st Sess., 2 (1933). Congress enacted the HOLA as a result of its dissatisfaction with state regulation of home financing. Stein, 604 F.2d at 1257. The OTS, an office of the Department of the Treasury, was thus created and vested with plenary authority to administer the HOLA.[4]
 
 
 26
 B. The HOLA and OTS Regulations Authorize ATM fees.
 
 
 27
 The HOLA empowers the OTS, "under such rules and regulations as [it] may prescribe — to provide for the organization, incorporation, examination, operation, and regulation of ... Federal savings associations ..., giving primary consideration of the best practices of thrift institutions in the United States." 12 U.S.C. § 1464(a). The HOLA authorizes the OTS to promulgate regulations "appropriate to carry out [its] responsibilities." 12 U.S.C. § 1463(a)(2). Pursuant to this authorization, the OTS regulates, inter alia, "the enforcement of laws, regulations, or conditions against such associations." 12 C.F.R. § 500.1(b).
 
 
 28
 The HOLA also permits federal savings associations to "establish remote service units for the purpose of crediting savings or demand accounts, debiting such accounts, crediting payments on loans, and [disposing] of related financial transactions as provided in regulations prescribed by the[OTS]." 12 U.S.C. § 1464(b)(1)(F). The OTS authorizes federal savings associations to use "electronic means or facilities to perform any function, or provide any product or service, as part of an authorized activity." 12 C.F.R. § 555.200(a). Electronic means or facilities include ATMs. Id. The OTS also permits federal savings associations to "transfer, with or without fee, [their] customers' funds from any account... of the customer at the Federal savings association or at another financial intermediary to third parties or other accounts of the customer on the customer's order or authorization by any mechanism or device." 12 C.F.R. § 545.17.
 
 
 29
 A federal savings association's authority to conduct electronic fund transfers is not limited to its own depositors. Rather, it applies to any "customer." Compare id. with 12 C.F.R. § 555.200(b) (authorizing the marketing and sale of electronic capacities and by-products to third-parties). The OTS further permits federal savings associations to charge fees for deposit and lending-related services. See 12 C.F.R. § 545.17 (authorizing transfer of funds "with or without fee"); 12 C.F.R. § 557.12(f) (authorizing "service charges and fees" for deposit-related activities); 12 C.F.R. § 560.2(b)(5) (authorizing "loan-related fees, including ... servicing fees"). It follows that a federal savings association may charge non-depositors for ATM services.
 
 
 30
 C. HOLA and OTS Regulations Preempt the Ordinances' ATM Fee Prohibition.
 
 
 31
 Having determined that the HOLA and OTS regulations permit federal associations to charge ATM fees to nondepositors, we also find that HOLA and OTS preempt the Ordinances.
 
 
 32
 Field preemption is implied when the scheme of federal regulation in a particular field is so pervasive as to leave no room for the States to supplement it. Rice, 331 U.S. at 230, 67 S.Ct. 1146. "Federal regulations have no less pre-emptive effect than federal statutes." de la Cuesta, 458 U.S. at 153, 102 S.Ct. 3014.
 
 
 33
 Indeed, the regulation of federal savings associations by the OTS is so "pervasive as to leave no room for state regulatory control." Stein, 604 F.2d at 1260. The Ordinances purport to regulate the operations, and the deposit and lending-related practices of federal savings banks. However, OTS regulations occupy these fields. See 12 C.F.R. § 545.2 (asserting field preemption of operations of federal associations); 12 C.F.R. § 557.11(b) (asserting field preemption of deposit-related practices of federal associations); 12 C.F.R. § 560.2(a) (asserting field preemption of lending-related practices of federal associations).
 
 
 34
 OTS Regulation 545 governs the operations of federal savings banks and expressly preempts contrary state law. Section 545.2 provides that the OTS has "plenary and exclusive authority ... to regulate all aspects of the operations of Federal savings associations." 12 C.F.R. § 545.2. It also provides that the exercise of this authority "is preemptive of any state law purporting to address the subject of the operations of a Federal savings association." Id.
 
 
 35
 The Cities illogically contend that the charging of ATM fees is not part of the "operations" of a federal savings association. However, "operations" include "funds transfer services," which federal savings associations are authorized to provide "with or without fee." 12 C.F.R. § 545.17. Moreover, federal associations are authorized to use "electronic means or facilities to perform any function, or provide any product or service." 12 C.F.R. § 555.200(a).
 
 
 36
 Therefore, we hold that the HOLA and OTS regulations together preempt conflicting state limitations on the authority of federal savings associations to collect fees for provision of deposit and lending-related electronic services and that prohibition of ATM fees by the Ordinances is therefore invalid under the Supremacy Clause of the Constitution. Because the ordinances are preempted for attempting to regulate the operations of federal savings banks, we do not discuss the alternate justifications for preemption including field preemption of deposit and lending-related activities as well as conflict pre-emption.
 
 
 37
 III. The National Bank Act Preempts the Ordinances.
 
 
 38
 We also find that National Bank Act preempts the Ordinances.
 
 
 39
 A. Historical Context.
 
 
 40
 National banks are "instrumentalit[ies] of the federal government, created for a public purpose, and ... subject to the paramount authority of the United States." Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299, 308, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978) (citation and internal quotation marks omitted). State attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties. First Nat. Bank v. California, 262 U.S. 366, 369, 43 S.Ct. 602, 67 L.Ed. 1030 (1923). The supremacy of the federal government in regulating national banks has long been recognized.[5]
 
 
 41
 The National Bank Act of 1864 was enacted to protect national banks against intrusive regulation by the States. See Cong. Globe, 38th Cong., 1st Sess., 1451 (1864) (noting that the "object" of the National Bank Act was to "establish a national banking system" free from intrusive state regulation); Marquette Nat'l Bank, 439 U.S. at 314-15, 99 S.Ct. 540 ("Close examination of the National Bank Act of 1864, its legislative history, and its historical context makes clear that ... Congress intended to facilitate ... a national banking system.") (internal quotations and citations omitted). To fulfill this Congressional purpose, the Supreme Court has "interpret[ed] grants of both enumerated and incidental `powers' to national banks as grants of authority not normally limited by, but rather ordinarily preempting, contrary state law." Barnett Bank, 517 U.S. at 32, 116 S.Ct. 1103 (citations omitted). Therefore, in determining the preemptive scope of federal statutes and regulations granting a power to national banks, the Supreme Court has adopted the view that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." Id. at 33, 116 S.Ct. 1103.
 
 
 42
 B. Incidental Powers of National Banks under 12 U.S.C. § 24 (Seventh).
 
 
 43
 The National Bank Act of 1864, 12 U.S.C. § 24 (Seventh), confers upon national banks the authority:
 
 
 44
 To exercise ... all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes....
 
 
 45
 12 U.S.C. § 24 (Seventh).
 
 
 46
 The "business of banking" is not limited to the powers enumerated in § 24 (Seventh). NationsBank v. Variable Annuity Life Ins. Co., 513 U.S. 251, 258 n. 2, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995). Therefore, the OCC "may authorize additional activities if encompassed by a reasonable interpretation of § 24 (Seventh)." Indep. Ins. Agents of Am., Inc. v. Hawke, 211 F.3d 638, 640 (D.C.Cir.2000).
 
 
 47
 Incidental powers include activities that are "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." M & M Leasing Corp. v. Seattle First Nat'l Bank, 563 F.2d 1377, 1382 (9th Cir.1977), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978), quoting Arnold Tours, Inc. v. Camp, 472 F.2d 427, 432 (1st Cir.1972). The incidental powers of national banks are thus not limited to activities deemed essential to the exercise of enumerated powers but include activities closely related to banking and useful in carrying out the business of banking. First Nat'l Bank v. Taylor, 907 F.2d 775, 778 (8th Cir.1990), cert. denied, 498 U.S. 972, 111 S.Ct. 442, 112 L.Ed.2d 425 (1990).
 
 
 48
 C. OCC Regulations Authorize National Banks to Charge ATM Fees.
 
 
 49
 OCC Regulation § 7.5002 authorizes national banks to "deliver through electronic means and facilities any ... service that [they are] otherwise authorized to... provide." 12 C.F.R. § 7.5002. Also, Regulation § 7.4003 authorizes national banks to operate ATMs pursuant to their incidental powers under 12 U.S.C. § 24 (Seventh). 12 C.F.R. § 7.4003. Finally, Regulation § 7.4002(a) authorizes national banks to collect "non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002(a). The establishment of such fees "are business decisions to be made by each bank ... according to sound business judgment and safe and sound banking principles." 12 C.F.R. § 7.4002(b)(2).[6] These regulations make no distinction between depositors and non-depositors with respect to a national bank's authority to collect fees for provision of authorized services. It follows that national banks may charge ATM fees to non-depositors.
 
 
 50
 The OCC has similarly construed the National Bank Act.
 
 
 51
 D. The OCC Has Reasonably Construed the National Bank Act as Authorizing the Charging of ATM Fees to Non-Depositors.
 
 
 52
 We give "great weight" to any reasonable construction of a regulatory statute adopted by the agency charged with its enforcement. Clarke v. Secs. Indus. Ass'n, 479 U.S. 388, 403, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). "As the administrator charged with supervision of the National Bank Act, the [OCC] bears primary responsibility for surveillance of `the business of banking' authorized by § 24 Seventh." NationsBank, 513 U.S. at 256, 115 S.Ct. 810 (internal citations omitted).
 
 
 53
 In its amicus brief and in two interpretive letters issued following passage of the Ordinances, the OCC has construed the incidental powers of national banks under § 24 (Seventh) as encompassing the provision of ATM services to nondepositors at a charge. The OCC's position is reasonable and thus entitled to "great weight." NationsBank, 513 U.S. at 256-57, 115 S.Ct. 810.[7]
 
 
 54
 The depositing of funds and the withdrawal of cash are services provided by banks since the days of their creation. Indeed, such activities define the business of banking. Although the ATM is a relatively new technology, the deposit and lending-related services offered through ATMs are traditional banking functions. As we held in M & M Leasing Corp., "the National Bank Act did not freeze the practices of national banks in their nineteenth century forms.... [W]e believe the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking." 563 F.2d at 1382. In our view, the widespread use of ATMs by banks to deliver deposit and lending-related services exemplifies a "new way[ ] of conducting the very old business of banking." Id.
 
 
 55
 We find no support in the Cities' contention that the charging of ATM fees to non-depositors renders the provision of ATM services beyond the incidental powers granted to national banks under § 24 (Seventh). As held in First Union Nat'l Bank v. Burke, 48 F.Supp.2d 132, 147 (D.Conn. 1999), the notion that "determination of state regulatory authority over national banks' ATM services is predicated on who accesses the ... ATMs, is without legal authority or sound rationale. The ATM service offered to [ ] non-depositors allows them to access their accounts at their own banks from a different geographic location and logically constitutes part of banking business."
 
 
 56
 The language of the National Bank Act provides no support for the Cities' position. To the contrary, Regulation § 7.4002(a) authorizes national banks to collect "non-interest charges and fees." 12 C.F.R. § 7.4002(a).
 
 
 57
 We hold that the National Bank Act and OCC regulations together preempt conflicting state limitations on the authority of national banks to collect fees for provision of deposit and lending-related electronic services and that prohibition of 20 ATM fees by the Ordinances is therefore invalid under the Supremacy Clause of the Constitution.
 
 
 58
 IV. The EFTA Does Not Save the Ordinances from Preemption by the HOLA and the National Bank Act.
 
 
 59
 The Cities contend that the EFTA authorizes states to regulate ATM fees as a consumer protection measure. This argument fails on two grounds. First, regulation of ATM fees is not the type of consumer protection measure contemplated by the EFTA. Second, the EFTA's anti-preemption provision does not preclude preemption of state laws by the HOLA and the National Bank Act.
 
 
 60
 A. Regulation of ATM Fees Is Not the Type of Consumer Protection Measure Contemplated by the EFTA.
 
 
 61
 The Ordinances purport to protect consumers against "excessive fees" and "anti-competitive" business practices that encourage consumers to hold their accounts at national banks who operate more ATMs in the Cities than state-chartered financial institutions. The Cities claim that prohibition of ATM fees is the type of consumer protection measure contemplated by the EFTA. However, the language and legislative history of the EFTA point to the contrary.
 
 
 62
 The stated purpose of the EFTA is to "provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693(b). The EFTA's "primary objective ... is the provision of individual consumer rights." Id.
 
 
 63
 The language of the EFTA indicates that the consumer protection measures contemplated by it are aimed at promoting disclosure, preventing fraud, and allocating liability. See 15 U.S.C. § 1693c (requiring disclosure of terms and conditions of electronic transfers); § 1693d (requiring documentation of transfers); § 1693e (requiring a writing for preauthorized electronic fund transfers); § 1693f (establishing procedures for error resolution); § 1693g (outlining consumer liability); § 1693h (outlining the liability of financial institutions); § 1693i (establishing requirements for issuance of cards); § 1693j (suspending consumer obligations in instances of system malfunction); § 1693l (prohibiting waiver of consumer rights under the EFTA).
 
 
 64
 The EFTA's ambit thus extends to regulation of ATM transactions. 15 U.S.C. § 1693a(6). However, the EFTA does not regulate ATM fees. Prohibition of ATM fees is not the type of consumer protection measure contemplated by the EFTA. The EFTA was enacted to prevent fraud, embezzlement, and unauthorized disclosure in electronic fund transfers, not to regulate service fees charged by financial institutions. See Kashanchi v. Texas Commerce Med. Bank, 703 F.2d 936, 940-41 (5th Cir. 1983) (noting that the "lack of a written record" and the "absence of any human contact" in electronic fund transfers were factors that "motivated Congress to pass the EFTA."), citing H.R.Rep. No. 95-1315, at 2 (1978) (Congress passed the EFTA because of its concern that electronic transactions were "much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods."); Wachter v. Denver Nat'l Bank, 751 F.Supp. 906, 908 (D.Colo.1990).
 
 
 65
 This is evident from the passage of the ATM Fee Reform Act of 1999,[8] which requires that ATM operators who impose a fee notify customers of imposition of the fee and of the amount and prohibits charging a fee unless the customer elects to continue with the transaction after receiving notice. 15 U.S.C. § 1693b(d)(3). By requiring that ATM operators notify customers of imposition of fees, Congress recognized that ATM operators can charge fees. Therefore, the prohibition of ATM fees is not the type of consumer protection measure contemplated by the EFTA.
 
 
 66
 B. The EFTA's Anti-Preemption Provision Does Not Apply to the HOLA and the National Bank Act.
 
 
 67
 The EFTA contains an anti-preemption provision which provides that state laws affording greater protection to consumers than the EFTA are not preempted by the EFTA. It provides:
 
 
 68
 This subchapter does not annul, alter, or affect the laws of any State relating to electronic fund transfers, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency. A State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection afforded by this subchapter.
 
 
 69
 15 U.S.C. § 1693q (emphasis added).
 
 
 70
 The Cities insist that § 1693q empowers them to regulate ATM fees charged by national banks and federal savings associations as a consumer protection measure. They claim that the EFTA's anti-preemption provision saves the Ordinances against preemption by the HOLA and the National Bank Act. However, the plain language of § 1693q indicates that it is limited to the EFTA. Section 1693q's reference to "this subchapter" indicates that the EFTA's anti-preemption provision does not apply to other statutes.
 
 
 71
 In Bank One v. Guttau, 190 F.3d 844 (8th Cir.1999), the Eighth Circuit rejected the same argument raised by the Cities here that the EFTA's anti-preemption provision authorizes states to regulate ATMs operated by national banks irrespective of whether the state regulations are preempted by the National Bank Act. The Eighth Circuit explained that the EFTA's "anti preemption provision is specifically limited to the provisions of the federal EFTA, and nothing therein grants the states any additional authority to regulate national banks." Id. at 850. It thus held that a state regulation restricting a national bank's placement of, and advertising on, ATMs was preempted by the National Bank Act notwithstanding the EFTA's anti-preemption provision.[9] Id.
 
 
 72
 Because the EFTA's anti-preemption provision is limited to the EFTA, it does not save the Ordinances against preemption by the HOLA and the National Bank Act. See Locke, 529 U.S. at 106, 120 S.Ct. 1135 (anti-preemption clause in Oil Pollution Act did not "extend to subjects addressed in the other titles of the Act or other acts" and therefore did not preclude preemption of state laws by Ports and Waterways Safety Act); Int'l Paper Co. v. Ouellette, 479 U.S. 481, 493, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (anti-preemption clause in citizen-suit provisions of the Clean Water Act did not "preclude pre-emption of state law by other provisions of the Act.").
 
 
 73
 We hold that the EFTA does not save the Ordinances from preemption by the HOLA and the National Bank Act.
 
 CONCLUSION
 
 74
 We hold that the HOLA and OTS regulations preempt the Ordinances from prohibiting federal savings associations to charge ATM fees to non-depositors. We also hold that the National Bank Act and OCC regulations preempt the Ordinances from prohibiting national banks to do the same. We further hold that the EFTA does not rescue the Ordinances from preemption. The district court correctly granted summary judgment and a permanent injunction prohibiting the Cities from enforcing the Ordinances.
 
 
 75
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Judge Trott votes to deny the petition for rehearing en banc, and Judges Goodwin and Sneed so recommend
 
 
 [1]
 When a non-depositor uses an ATM owned by Wells Fargo Bank or Bank of America, he is charged a total of $3.50 for the transaction. Three categories of fees are involved in this transaction: (1) a $1.50 "surcharge" is charged by the bank operating the ATM, (2) a $2.00 "foreign fee" is charged by the customer's home bank for using an ATM operated by another bank, and (3) a $0.50 "interchange fee" is paid by the home bank to the bank operating the ATM. The Ordinances prohibit only the $1.50 surcharge ("ATM fee")
 
 
 [2]
 "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2
 
 
 [3]
 See, e.g., 12 C.F.R. §§ 557.13(a) & 560.2(c) (state laws pertaining to contract and commercial law, tort law, criminal law, real property law, and homestead law are not preempted by OTS regulations);de la Cuesta, 458 U.S. at 172, 102 S.Ct. 3014 ("Nothing in the language of ... HOLA ... suggests that Congress intended to permit the [OTS] to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices.") (O'Connor, J., concurring); First Nat'l Bank v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969) (allowing application of a Florida branch bank statute to national banks in the state); Franklin Nat. Bank v. New York, 347 U.S. 373, 378 n. 7, 74 S.Ct. 550, 98 L.Ed. 767 (1954) ("[N]ational banks may be subject to some state laws in the normal course of business if there is no conflict with federal law."); see also Nat'l State Bank v. Long, 630 F.2d 981, 985 (3d Cir.1980) ("[R]egulation of banking has been one of dual [federal-state] control since the passage of the first National Bank Act in 1863."); Perdue v. Crocker Nat'l Bank, 38 Cal.3d 913, 937, 216 Cal.Rptr. 345, 702 P.2d 503 (1985) ("Congress has declined to provide an entire system of federal law to govern every aspect of national bank operations."), appeal dismissed, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986) (noting lack of jurisdiction).
 
 
 [4]
 12 C.F.R. §§ 500.1(a) (the OTS "is responsible for the administration and enforcement of the [HOLA]"), 500.10 (the functions of the OTS are to "charter, supervise, regulate and examine Federal savings associations");de la Cuesta, 458 U.S. at 144, 102 S.Ct. 3014 (noting that the Federal Home Loan Bank Board, the predecessor to the OTS, was created in 1932 to administer the HOLA).
 
 
 [5]
 See Barnett Bank, 517 U.S. at 32-36, 116 S.Ct. 1103 (federal statute authorizing national banks to sell insurance in small towns preempts contrary state statute); Franklin Nat. Bank, 347 U.S. at 377-79, 74 S.Ct. 550 (national banks' express power to receive deposits preempts state statute prohibiting use of word "savings" by other than locally-chartered banks); First Nat. Bank, 262 U.S. at 369, 43 S.Ct. 602 (national banks' power to receive deposits preempts contrary state escheat law); Easton v. Iowa, 188 U.S. 220, 238, 23 S.Ct. 288, 47 L.Ed. 452 (1903) (state statute prohibiting receipt of deposits by insolvent banks is inapplicable to national banks); M'Culloch, 17 U.S. at 325-30 (states lack the power to tax national banks).
 
 
 [6]
 Regulation § 7.4002(b)(2) further provides:
 A national bank establishes non-interest charges and fees in accordance with safe and sound banking principles if the bank employs a decision-making process through which it considers the following factors, among others: (i) The cost incurred by the bank in providing the service; (ii) The deterrence of misuse by customers of banking services; (iii) The enhancement of the competitive position of the bank in accordance with the bank's business plan and marketing strategy; and (iv) The maintenance of the safety and soundness of the institution.
 
 
 [12]
 C.F.R. § 7.4002(b)(2). The OCC found that the Banks had properly considered these factors in deciding to charge ATM fees to nondepositors
 
 
 [7]
 The Cities insist that the OCC's opinion letters and amicus briefs are not entitled to deference. As explained above, the Cities' argument lacks merit. We find the OCC's opinion letters to be both persuasive and consistent with the National Bank Act and OCC regulations and thus at least "entitled to respect."Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Moreover, that the OCC's construction of the National Bank Act comes to us in the form of an amicus brief does not make it "unworthy of deference." See Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (noting that an agency's position in an amicus brief is not "unworthy of deference" when "[t]here is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.").
 
 
 [8]
 The ATM Fee Reform Act of 1999, Pub.L. No. 106-102, §§ 701-05, 113 Stat. 1463 (1999), was enacted as part of the Gramm-Leach-Bliley Financial Modernization Act and is incorporated in the EFTA as 15 U.S.C. § 1693b(d)(3)
 
 
 [9]
 See also Burke, 48 F.Supp.2d at 147 (The EFTA "does not contain language from which it can be reasonably inferred that Congress intended to disrupt other federal laws including the National Bank[ ] Act by an implicit reservation of the power to administratively regulate banks to the states.").