**Hans W. FLAGG and Eileen S. Flagg, on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**YONKERS SAVINGS AND LOAN ASSOCIATION, FA, also known as Yonkers Financial, Defendant–Appellee.**

**Docket No. 04–1948–CV.**

United States Court of Appeals, Second Circuit.

Argued: Nov. 18, 2004.

Decided: Jan. 21, 2005.

William R. Weinstein, Wechsler Harwood, LLP, New York, N.Y. (Michael Katz, Rabunski & Katz, LLP, New York City, on the brief), for Plaintiffs–Appellants.

Jean E. Burke, Thacher Proffitt & Wood, LLP, New York City (Doreen

Klein, on the brief), for Defendant–Appellee.

H. Rodgin Cohen, Sullivan and Cromwell LLP (Bruce E. Clark, of counsel), New York City, for the New York Bankers' Association as amicus curiae in support of Defendant–Appellee.

Before: OAKES, CALABRESI, and STRAUB, Circuit Judges.

STRAUB, Circuit Judge.

The small universe of facts germane to the present appeal is set forth in the decision of the District Court, reported at *Flagg v. Yonkers Sav. & Loan Ass'n,* 307 F.Supp.2d 565 (S.D.N.Y.2004). We recite them here only briefly.

Plaintiffs–Appellants Hans and Eileen Flagg (the "Flaggs") entered into a mortgage agreement with defendant-appellee Yonkers Savings and Loan Association ("Yonkers") on June 12, 1998. Pursuant to that agreement, and consistent with federal laws and guidelines that regulate Yonkers as a federal savings association, the Flaggs deposited funds into an escrow account from which property taxes, insurance, and other fees associated with the mortgaged property were to be paid. In relation to these escrow funds, the mortgage agreement provided that "Lender will not be required to pay me any interest or earnings on the Funds unless either (i) Lender and I agree in writing at the time I sign this Security Instrument, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds." The principal issue on appeal is whether "the law" so required.

Until May 2002 Yonkers did not pay interest to the Flaggs on funds held in the escrow account. In May 2002 Yonkers merged with Atlantic Bank of New York ("Atlantic"), a wholly-owned subsidiary of the National Bank of Greece. After this merger Atlantic began to pay interest on the funds held in the Flaggs' mortgage escrow account. The Flaggs subsequently sued Yonkers based on New York statutes, New York common law, and the Fifth Amendment to the United States Constitution, seeking declaratory judgment and compensation for past interest that they allege is owed to them under New York law for the pre-merger period. Yonkers moved for dismissal for failure to state a claim upon which relief could be granted. The Flaggs cross-moved for summary judgment. By its March 8, 2004, decision, the District Court granted Yonkers's motion and denied the Flaggs' motion as moot based on its determination that federal law and regulations had preempted the field of mortgage escrow accounts held by federal savings associations and its finding that federal law did not mandate payment of interest on such accounts. The Flaggs now appeal. We affirm.

## DISCUSSION

The Flaggs raise three issues on appeal. First, they maintain that New York State law required that Yonkers pay them interest on their mortgage escrow account. Second, they contend that the contract governing their mortgage escrow account incorporated New York law, thereby obligating Yonkers to pay interest on the account under the contract. Third, the Flaggs assert that the District Court erred in dismissing their Fifth Amendment claim. We do not find merit in any of these arguments.

I. *Federal Law Preempts the Field of Mortgage Escrow Accounts Held by Federal Savings Associations.*

New York law requires "mortgage investing institutions" to pay interest on mortgage escrow accounts on a quarterly basis at a rate of "not less than two per-

centum per year based on the average of the sums so paid for the average length of time on deposit or a rate prescribed by the banking board pursuant to section fourteen-b of the banking law and pursuant to the terms and conditions set forth in that section whichever is higher." N.Y. Gen. Oblig. Law § 5–601; *see also* N.Y. Banking L. § 14–b (describing the power of the New York Banking Board to prescribe minimum rates of interest to be paid on residential mortgage escrow accounts). Looking at Yonkers's failure to pay interest on their mortgage escrow account through the lens of these statutory provisions the Flaggs cannot be blamed for thinking that they were denied something due to them. No matter how intense their outrage, however, they cannot claim that they suffered any injustice because preemptive exercise of federal authority by the Office of Thrift Supervision freed Yonkers, as a federal savings association, from any obligation to pay interest on mortgage escrow accounts under New York law.

Pursuant to the authority granted to it by the Home Owners' Loan Act, 12 U.S.C. § 1461 *et seq.* ("HOLA"), the Office of Thrift Supervision ("OTS"), which operates under the aegis of the Department of Treasury to provide for, *inter alia,* the "examination, safe and sound operation, and regulation of savings associations," 12 U.S.C. § 1463(a)(1), has "authority [that] is preemptive of any state law purporting to address the subject of the operations of a Federal savings association." 12 C.F.R. § 545.2. Seized of this authority, the OTS has "occupie[d] the entire field of lending regulation for federal savings associations." 12 C.F.R. § 560.2(a). Among these are "laws purporting to impose requirements regarding ... [e]scrow accounts." 12 C.F.R. § 560.2(b). In exercise of this asserted authority, the OTS has removed all legal obligations that fed-eral savings associations may have to pay interest on mortgage escrow accounts, "allowing such matters to be governed by the loan contract." 48 Fed.Reg. 23032.01, 23039 (May 23, 1983). Based on these statutory and regulatory sections, the District Court found that OTS regulations preempted state law in areas affecting federal savings and loan institutions. *Flagg,* 307 F.Supp.2d at 574–75.

On appeal the Flaggs do not contest the District Court's determination that the OTS has preempted state law with respect to the provision of interest on mortgage escrow accounts; rather, the Flaggs contend that this OTS action exceeds the authority granted to it by HOLA and is an arbitrary and unreasonable exercise of its regulatory power. We do not agree. Consistent with the District Court, we find that the exercise of authority here is neither arbitrary nor unreasonable and is within the broad grant of power to the OTS contained in HOLA.

■ "Federal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited." *Fid. Fed. Sav. & Loan Ass'n. v. de la Cuesta,* 458 U.S. 141, 153–154, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (internal citations omitted); *see also La. Pub. Serv. Comm'n. v. F.C.C.,* 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority.... [T]he best way of determining whether Congress intended the regulations of an administrative

agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency." (internal citations omitted)).

This evaluation is usually informed by a presumption in favor of the authority of state law in areas of activity traditionally allocated to the supervisory organs of the various states. *See Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The presumption against federal preemption disappears, however, in fields of regulation that have been substantially occupied by federal authority for an extended period of time. *See United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). Regulation of federally chartered banks is one such area. *See Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 32–33, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (citing cases dating to 1877 that document the long history of federal regulations' preempting of state laws that purport to govern federally chartered banks); *Bank of Am. v. City and County of San Francisco*, 309 F.3d 551, 558 (9th Cir.2002) (tracing the history of federal preemption of state laws that purport to govern federally chartered banks to *McCulloch v. Maryland*, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819)).

HOLA, in pertinent part, provides that "[t]he Director [of the OTS] *may issue such regulations as the Director determines to be appropriate* to carry out the responsibilities of the Director or the Office," 12 U.S.C. § 1463(a)(2) (emphasis added), and that "the Director is authorized, *under such regulations as the Director may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings associations.*" *Id.* § 1464(a) (emphasis added). This is an extremely broad grant of power that provides ample authority for the Di-

rector's efforts to enforce consistent, nationwide regulations affecting lending practices, by preempting, *inter alia,* "state laws purporting to impose requirements regarding ... [e]scrow accounts." 12 C.F.R. § 560.2(b).

While the propriety of this particular use of regulative power by the OTS appears to present a novel question in this Circuit, there is ample analogous precedent to demonstrate that this exercise of preemption is within reason and HOLA's grant of authority. In *de la Cuesta,* for example, the Supreme Court was asked to consider the OTS's authority to promulgate and enforce 12 C.F.R. § 545.8, which regulates the inclusion of "due-on-sale clauses" in mortgage agreements. In that regulatory provision, the Federal Home Loan Bank Board, the predecessor to the OTS, exhibits a clear intention to pre-empt state regulations dealing with due-on-sale clauses incorporated into mortgage agreements. 458 U.S. at 154, 158, 102 S.Ct. 3014. Relying on the legislative history of HOLA and the language of the statute, the Supreme Court held that preemption of mortgage contracts was a reasonable exercise of the broad authority granted to the regulator by authority of HOLA. *Id.* at 159–67, 102 S.Ct. 3014. Similarly, in *Bank of America v. City and County of San Francisco,* the Ninth Circuit Court of Appeals was asked to review the authority of the OTS to establish and enforce regulations affecting ATM charges. 309 F.3d at 558. Relying in part on 12 C.F.R. § 560.2, the court held that HOLA and OTS regulations have preempted the field of law affecting ATM transactions with federal savings associations and, therefore, have preempted conflicting local rules. *Id.* at 560–61.

We cannot discern a critical difference between these cases and the one at bar. HOLA gives a broad grant of authority to

the OTS. We see no basis for concluding that the use of that authority here is outside the authority of the OTS.

We also find that the OTS's use of its authority in this case is not arbitrary. We recognize the potential interest that the OTS has in providing for consistency across the field of mortgage accounts offered by federal savings associations. *See* 12 C.F.R. § 560.2 (stating desire to "give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation" as a motive for exercise of OTS preemptive authority over, *inter alia*, "[e]scrow accounts"). The choice made here, to relieve institutions of any legal duty to pay interest on escrow funds while preserving the possibility that individual institutions and their clients may negotiate provision of some interest, provides a consistent nationwide playing field while giving individual institutions a level of flexibility. This achievement alone demonstrates that preemption in this field is sensible enough to dodge accusations of arbitrariness in the abstract.

More concretely, the Flaggs claim that the OTS regulation releasing federal savings associations from responsibility to pay interest on escrow funds is unreasonable and without authority because it is inconsistent with provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* The purpose of RESPA is to address "certain abusive practices that have developed" in relation to the disclosure of information regarding the "nature and costs of the [real estate] settlement process." 12 U.S.C. § 2601. RESPA generally requires that lenders disburse escrow funds in an appropriate and timely manner and that they provide regular reporting of such disbursements.[1] Authority to establish rules and regulations governing RESPA is assigned to the Secretary of Housing and Urban Development. *See* 12 U.S.C. §§ 2602(1)(B)(6), 2617.

Most germane to the present case is RESPA's interest in effecting a "reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance." 12 U.S.C. § 2601(b)(3). Specifically, 12 U.S.C. § 2609(a) limits the amount of money that a borrower can be required to deposit in an escrow account established for the purpose of paying taxes, fees and insurance. The Flaggs argue that this provision modifies or supercedes HOLA because the New York requirement that lenders pay interest on escrow funds reduces the overall amount of money that a borrower needs to contribute in order to pay taxes, fees, and insurance premiums. Given this, the Flaggs contend that rules governing provision of interest on escrow accounts must give way to the authority of both RESPA and the Department of Housing and Urban Development, though other aspects of federal savings associations' activities will remain under the authority of HOLA and the OTS. Given that New York law in this case provides added consumer benefits, the Flaggs conclude that the OTS would exceed its RESPA limited authority were it to preempt New York law in this circumstance. While creative, we do not find this argument persuasive for two principal reasons.

---

1. That the OTS understands its obligations to issue regulations consistent with RESPA is evident by its disclosure rules, which specifically reference RESPA. *See* 48 Fed.Reg. 23032. That Yonkers attempted to abide by these legislative rules is evidenced in the mortgage agreement, which discusses legal limits on amounts that Yonkers may require the Flaggs to deposit in escrow and describes Yonkers's duties of reporting and disclosure.

First, RESPA and HOLA are not coextensive. RESPA applies to all mortgage loans that are "federally related." 12 U.S.C. § 2602. HOLA applies to federal savings associations. 12 U.S.C. § 1463. By design, then, RESPA regulates a narrow field of financial transactions engaged in by a broad group of financial institutions, *cf.* 12 U.S.C. § 2606 (describing exempted transactions), while HOLA regulates a specific breed of financial institutions in respect of all of their transactions and activities, *see, e.g., Fid. Fed. Sav. & Loan Ass'n. v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (due-on-sale clauses); *Bank of Am. v. City and County of San Francisco,* 309 F.3d 551 (9th Cir.2002) (ATM charges).

Given that HOLA deals with institutions and RESPA deals with transactions, it simply does not make sense to read RESPA as superceding HOLA and preventing the OTS from asserting regulatory authority over the policies and practices of federal savings associations with respect to escrow accounts. The more sensible reading of these statutes is that federal savings associations, like all grantors of mortgage loans, must abide by RESPA as interpreted by the Secretary of Housing and Urban Development. The OTS cannot, therefore, promulgate rules and regulations that are contrary to RESPA. That this is so does not, however, exclude the OTS from preempting the field of rules governing federal savings associations and establishing nationwide regulations governing these institutions that are consistent with federal law, including RESPA.[2]

Second, the Flaggs' reliance on RESPA's statement of purpose found at 12 U.S.C. § 2601(b)(3) is misplaced. RESPA is meant to regulate the amount of money that a borrower is required to deposit in escrow by tying that amount to the costs the escrow fund is meant to secure. RESPA is not, however, designed to reduce the dollar costs of taxes, fees, and insurance premiums. RESPA can, and does, accomplish its task by setting rules on required escrow contributions. That this system may, in the end, be more expensive to borrowers than, say, keeping their money in interest-bearing accounts to pay their own bills, does not violate RESPA's stated goal of "reduc[ing] the amounts home buyers are required to place in escrow accounts." 12 U.S.C. § 2601(b)(3).

■ The Flaggs express some concerns that mortgage contracts are prepared by lending institutions and constitute contracts of adhesion. However, this particular contract specifically provides an opportunity for mortgagees of Yonkers to negotiate, by separate agreement, payment of interest on escrow accounts. It cannot, therefore, be a contract of adhesion. Moreover, the Flaggs do not appear to have attempted to negotiate interest terms on their escrow account. Having failed to take advantage of the invitation extended in the contract, the Flaggs' argument that the contract, by virtue of disparities in power between the parties, was effectively a contract of adhesion fails to persuade. Their argument is only made less persuasive when one considers that Atlantic, which currently is host to the Flaggs' account, *does* pay interest on mortgage escrow accounts. This fact suggests that the mortgage-lender marketplace is inhabited by lenders who *do* pay interest on mortgage escrow accounts, providing both options and bargaining power to borrowers such as the Flaggs.

---

2. We have considered the Flaggs' argument that 12 U.S.C. § 2616 bars preemption. For those reasons stated that deal with the general relationship between RESPA and HOLA, we find this argument to be without merit.

## II. *The Mortgage Contract Does Not Incorporate State Law.*

■ The Flaggs contend that, even if Yonkers was not bound by New York law requiring payment of interest on mortgage escrow accounts, their contract with Yonkers incorporated New York law, therefore requiring that Yonkers pay interest to the Flaggs under the contract. In support of this argument, the Flaggs point to section fifteen of the contract, titled "Law that Governs this Security Instrument." That section reads, in its entirety:

This Security Instrument is governed by federal law and the law that applies in the place where the Property is located. If any term of this Security Instrument or of the Note conflicts with the law, all other terms of this Security Instrument and of the Note will still remain in effect if they can be given effect without the conflicting term. This means that any terms of this Security Instrument and of the Note which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

This section of the contract, is, by title and content, a choice of law provision. While contracts may incorporate particular laws as contract terms, the contract must do so with specificity. General choice of law provisions do not accomplish this task. *See Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 123 (2d Cir.2003) (without clear language of incorporation, a general choice of law provision was held not to have incorporated New York arbitration law into a contract).

The contract specifically states that Yonkers will not pay interest on the account unless required by law. Since, per HOLA and OTS regulations, Yonkers is not required by law to pay interest, the contract does not commit Yonkers to pay interest to the Flaggs on this mortgage escrow account.

## III. *The Flaggs' Fifth Amendment Claim Fails.*

■ The Flaggs claim that Yonkers's failure to pay interest on amounts held in the mortgage escrow account constituted an uncompensated taking in violation of their Fifth Amendment rights. The District Court granted Yonkers's motion to dismiss this claim based primarily on its finding that there was no state action. *Flagg v. Yonkers Sav. & Loan Ass'n.*, 307 F.Supp.2d 565, 585 (S.D.N.Y.2004). We agree.

■ "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.'" *United States v. Int'l. Bhd. of Teamsters*, 941 F.2d 1292, 1295 (2d Cir.1991). "[S]tate action requires *both* an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' *and* that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). While Yonkers's election not to pay interest to the Flaggs on their escrow account may qualify as an "exercise" of a "privilege created by the State," its action is not "fairly attributable to the State," *Sullivan*, 526 U.S. at 50, 119 S.Ct. 977, and, therefore, it was not a "state actor" for purposes of evaluating the legal merits of the Flaggs' takings claim.

 Though Yonkers is a "federal savings association," it is a private corporation, not a state agency. "For the conduct of a private entity to be fairly attributable to the state, there must be such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Cranley v. Nat'l Life Ins. Co.,* 318 F.3d 105, 111 (2d Cir.2003) (internal quotations omitted). A nexus of "state action" exists between a private entity and the state when "the state exercises coercive power, is entwined in the management or control of the private actor, or provides the private actor with significant encouragement, either overt or covert, or when the private actor operates as a willful participant in joint activity with the State or its agents, is controlled by an agency of the State, has been delegated a public function by the state, or is entwined with governmental policies." *Id.* at 112 (internal quotations and alterations omitted). By these well-established standards, no nexus existed between the OTS and Yonkers's decision not to pay interest on the Flaggs' escrow account.

While federal law freed Yonkers, as a federal savings association, from any legal duty to pay interest on mortgage escrow accounts, there was no federal mandate prohibiting Yonkers from paying interest to the Flaggs or any other mortgagee-client. Neither did any state agent advise or command that Yonkers not pay interest on mortgage escrow accounts. In fact, the OTS was neutral on the subject, leaving negotiation of interest payments on escrow accounts to the contracting parties. Neither the OTS nor any other state agency was party to the Flaggs' contract with Yonkers. There was no OTS–Yonkers joint enterprise; and no state function was delegated to Yonkers as a mortgagor. In short, Yonkers was a private entity participating in a regulated field of activity. Yonkers's actions were consistent with the law, to be sure, but obedience to the law alone does not create a sufficient nexus with the state to sustain a finding of "state action."

We have reviewed all of appellants' remaining arguments and find each of them to be without merit. For the foregoing reasons, the judgment of the District Court is AFFIRMED.