**AMERICAN BANKERS ASSOCIA-TION, a national trade association, et al., Plaintiffs,**

v.

**Bill LOCKYER, Attorney General of the State of California, et al., Defendants.**

No. CV.S–02–1138 FCD JFM.

United States District Court, E.D. California.

Dec. 23, 2002.

John Joseph Quinn, Jr., Laurence J. Hutt, Arnold and Porter, Los Angeles, CA, Dennis G. Lyons, Michele J. Woods, Christine E. Koh, Howard N. Cayne, Arnold and Porter, Washington, DC, for plaintiffs.

Robyn Cerny Smith, Atty. General's Office of State of Cal., Los Angeles, CA, Susan Eileen Henrichsen, Atty. General's Office of State of Cal, San Diego, CA, for defendants.

Douglas B. Jordan, Office of Comptroller of Currency, Washington, DCF, for Amicus Curiae.

### MEMORANDUM AND ORDER

DAMRELL, District Judge.

This action is before the court on plaintiffs American Bankers Association, America's Community Bankers, Chase Manhattan Bank USA, N.A., Citibank (South Dakota), N.A., Consumer Bankers Association, Credit Union National Association, Inc., First USA Bank, N.A., Household Bank (SB), N.A., Independent Community Bankers of America, MBNA America Bank, N.A., and National Association of Federal Credit Unions' (collec-

tively, "plaintiffs") (1) motion for a preliminary injunction, and (2) motion for summary judgment and permanent injunctive relief. Briefing has been submitted by the parties as well as *amicus curiae* Office of the Comptroller of the Currency ("OCC") in support of the motions, and *amicus curiae* Consumers Union, Consumer Action, California Public Interest Research Group (CalPIRG), Consumer Federation of America, National Consumer Law Center, United States Public Interest Research Group, and AARP ("Consumers Union") in opposition to the motions. Plaintiffs seek a preliminary injunction restraining defendants Bill Lockyer, Attorney General of the State of California, and Kathleen Hamilton, Director of the California Department of Consumer Affairs ("defendants" or the "State") from enforcing California Civil Code section 1748.13 (the "statute" or "section 1748.13"). Plaintiffs further seek summary judgment and a permanent injunction against defendants' enforcement of the statute on the basis that section 1748.13 is preempted by federal banking laws and thus inapplicable to all federally chartered credit card issuers. The court heard oral argument on December 6, 2002, and by this order now renders its decision.

## FACTUAL BACKGROUND

### 1. California Civil Code Section 1748.13

In 2001, the California legislature passed Assembly Bill Number 865. *See* Resp. of Defs. Bill Lockyer and Kathleen Hamilton to Pltfs.' Statement of Undisputed Facts ("UF"), filed Oct. 25, 2002, UF

1. The Bill was codified as California Civil Code section 1748.13. *Id.* The Attorney General and Department of Consumer Affairs have the power and duty to enforce section 1748.13. UF 2.

Section 1748.13 requires that certain language and information be placed on the billing statements credit card issuers provide their cardholders. The statute applies to all credit cards,[1] but differentiates "retail credit cards" as a separate category with slightly different requirements.[2] *See* Cal. Civ.Code §§ 1748.13(a)(1)(A)(ii), 1748.13(b)(3).

According to defendants, the statute was designed to provide credit card users with warnings about the length of time and total amount of cost a cardholder will incur if (s)he repays the outstanding balance on a credit card by remitting only the minimum payment on each periodic bill. Section 1748.13 requires credit card issuers to include the warnings contemplated by the statute except in billing cycles where they either: (1) require a minimum payment of at least 10% of the cardholder's outstanding balance; or (2) do not impose finance charges. Cal. Civ.Code § 1748.13(c)(1)-(2); UF 4.

When credit card issuers do not meet these exceptions, they must provide the warnings and information to cardholders contemplated by the statute. First, each cardholder's bill must display two messages on the front of the first page, in capitalized type that is at least 8–point size. Cal. Civ.Code § 1748.13(a); UF 3. The first message is required and must state, "Minimum Payment Warning: Mak-

---

1. Credit cards are defined under section 1748.12 as "[a]ny card, plate, coupon book, or other single credit device existing for the purpose of being used from time to time upon presentation to obtain money, property, labor or services on credit."

2. Retail credit cards are those that are "[i]ssued by or on behalf of a retailer, or a private label credit card that is limited to customers of a specific retailer." Cal. Civ.Code § 1748.13(b)(3).

ing only the minimum payment will increase the interest you pay and the time it takes to repay your balance." Cal. Civ. Code § 1748.13(a)(1); UF 3. The statute also requires a second message, but allows the credit card issuer to decide between two optional methods of presenting further warnings and distributing information required by the statute. The credit card issuer must decide to provide one of the following options.

The first option is set out in section 1748.13(a)(2)(A). It provides that immediately after the Minimum Payment Warning, the credit card issuer must provide a short statement that describes the time it would take and the total cost to a cardholder if (s)he paid off balances of $1000, $2500, and $5000 by paying only the minimum payment, if the billing was based on an annual percentage rate of 17% and a minimum payment of 2% of the bill or $10 (whichever was greater). UF 3. Credit card issuers can satisfy the requirements of this option if they provide the same information for the three specified balance amounts at the annual percentage rate and required minimum payment which are applicable to an individual cardholder's account. Cal. Civ.Code § 1748.13(a)(2)(A)(i); UF 3.[3] If the credit card issuer chooses to provide this message then, immediately following the required wording, it must provide the following written statement: "For an estimate of the time it would take to repay your balance, making only minimum payments, and the total amount of those payments, call this toll-free number: (Insert toll-free telephone number)." Cal. Civ.Code § 1748.13(a)(3)(A); UF 3. The statute requires that the toll-free number

be available between the hours of 8 a.m. and 9 p.m. Pacific Standard Time, seven days a week. The statute also mandates that the toll-free number provide consumers with the opportunity to speak to a person, rather than a recording, from whom the individualized account information discussed above can be obtained. Cal. Civ.Code § 1748.13(a)(3)(B); UF 3.

The second option, under section 1748.13(a)(2)(B), allows a creditor to print a written statement on the front of the bill's first page that provides individual, "customized" information to the cardholder. UF 3. This information would indicate an estimate of the number of years and months and the approximate total cost to pay off the entire balance due on an account if, based on the terms of the credit agreement, the cardholder were to pay only the minimum amount due for each bill. If the credit card issuer chooses this option, the bill must also provide the cardholder with either a referral to a credit counseling service or the "800" number for the National Foundation for Credit Counseling (through which the cardholder can be referred to credit counseling services in, or closest to, the cardholder's county of residence).[4] A credit card issuer is *required* to use this option if the cardholder has not paid more than the minimum payment for 6 consecutive months after July 1, 2002. Cal. Civ.Code § 1748.13(a)(2)(B); UF 3; UF 8.

In addition to the requirements described above, the statute mandates that the Department of Financial Institutions ("DFI") establish a detailed table illustrating the approximate number of months

---

**3.** Similar requirements are imposed on retail credit card issuers. *See* Cal. Civ.Code § 1748.13(a)(2)(A)(ii).

**4.** If the credit card issuer employs this option and the account is based on a variable rate,

the credit card company may make disclosures based on the rate for the entire balance as of the date of the disclosure and indicate that the rate may vary.

and approximate total cost to repay an outstanding balance if the consumer pays only the required minimum monthly payments and if no other fees are incurred. Cal. Civ.Code § 1748.13(a)(3)(C). These tables must consider: a significant number of interest rates (§ 1748.13(a)(3)(C)(i)); a significant number of different account balances (with the difference between amounts considered no greater than $100) (§ 1748.13(a)(3)(C)(ii)); a significant number of different payment amounts (§ 1748.13(a)(3)(C)(iii)); and that only minimum monthly payments are made with no additional charges or fees incurred on the account. Cal. Civ.Code § 1748.13(a)(3)(C)(iv).

The information developed by the DFI can be referenced when a cardholder calls the toll-free line and requests information on how long and at what cost they would pay off a balance using a minimum payment, or when the credit card issuer is required to disclose this information to cardholders who have paid only the minimum for 6 consecutive months. However, credit card issuers are not allowed to include the full chart with a billing statement to satisfy their obligations under the statute. Cal. Civ.Code § 1748.13(a)(3)(D); UF 7.

### 2. Consumer Debt

Defendants maintain that the statute should withstand constitutional challenge because it benefits Californians by requiring credit card issuers to provide information regarding the costs and consequences of remitting only minimum monthly credit card payments. Defs.' Mem. of P. & A. in Opp'n to Pltfs.' Appl. for a Prelim. Inj. and Mot. for Summ. J. ("Defs.' Opp'n to MSJ"), filed Oct. 25, 2002, at 2. Defendants represent that "U.S. and California households are facing an unprecedented debt crisis, brought about in large part by high levels of revolving credit card debt." *Id.* at 3.

A marked increase in purchases made with credit cards in the 1990s is in part responsible for the now-record levels of indebtedness across the United States. *Id.* Between 1990 and 2001, the total amount of revolving debt in United States households increased by 193%, from $190.9 to $559.6 billion. *Id.* at 3; Defs.' App. of Non–Federal Authorities and Other Cited Sources in Supp. of Defs.' Opp'n to Pltfs.' Appl. For Prelim. Inj. and Mot. for Summ. J. ("Defs.' App."), filed Oct. 25, 2002, at Exs. 24, 33. Defendants represent that in 2001, at least 55% of United States households (or approximately 41.7 million households total) holding a credit card revolved balances from month to month.[5] Californians accounted for approximately 4.5 million of these households, for a total sum of $61 billion in revolving debt owed by California's credit cardholders alone. Defs.' Opp'n to MSJ at 3–4.

The problem was further compounded in the 1990s when the growth of consumer debt exceeded the growth of personal disposable income. *Id.* at 4. For example, defendants represent that between 1989 and 1998, the median annual income increased 34%, while the median debt increased 148% and credit card debt increased 111%. *See* Defs.' App. at Exs. 38, 48, 49. In addition, for the first time in history, total household debt surpassed total household income in the United States in 2001. Defs.' Opp'n to MSJ at 4.

---

**5.** Defendants' citation for this statistic appears to be in error. In footnote 6 of their opposition brief, defendants cite to their appendix of authorities at Ex. 32, page 625. However, that exhibit only reflects statistics through the year 2000, and the particular table on page 625 only reflects statistics through 1998.

Defendants maintain that low and middle-income households, as well as college students, are "bearing the brunt" of this debt crisis. *Id.* at 5. In support of their position, defendants point to data indicating that low and middle-income households hold higher credit card debt-to-income ratios than others. *Id.* at 5–6. In addition, college students are increasingly graduating with large amounts of credit card debt. Manning Decl., filed Oct. 29, 2002, at ¶ 29. Defendants posit that lower-income and college-aged individuals are less likely to understand the consequences of making only minimum monthly payments on their credit cards while continuing to accrue additional charges. *Id.* at ¶¶ 34, 38, 39. Further, defendants note the major incentive of credit card issuers to target low and middle-income households, due to the fact that the issuers make the majority of their profits from these populations. *Id.* at ¶ 9.

Finally, defendants cite a number of practical consequences resulting from the debt crisis, including the following: a rising number of delinquent accounts and personal bankruptcies; resulting financial instability and increasing family pressures, including health problems and divorce; bad credit resulting in inability to finance purchases of homes and cars; and adverse effects on the health of children, communities, and attendance at work. *See* Defs.' Opp'n to MSJ at 8–10 and accompanying citations. Thus, the State asserts that enactment of section 1748.13 will benefit Californians by requiring credit card issuers to inform consumers about the consequences of making minimum monthly credit card payments. *Id.* at 10.

### 3. The Statute's Burdens

Unsurprisingly, the parties disagree over the extent of burdens imposed by the statute. Plaintiffs maintain that the costs of compliance with the statute will amount to millions of dollars in the aggregate in the first six months following implementation alone.[6] Staten Decl. No. 4, filed Sept. 20, 2002, at ¶ 5. Plaintiffs break down the cost estimates of compliance as follows:

(A) Total "startup" costs already incurred: $3,352,797;

(B) Estimated one-time future startup costs: $15,063,069;

(C) Average monthly total of estimated ongoing costs for the six months following implementation of the statute: $2,395,328.50; and

(D) Average monthly total of estimated ongoing costs after the first six months following implementation of the statute: $1,904,732, including $684,642.50 for operation of the phone bank.

Staten Decl. No. 4 at ¶ 5. The types of monetary costs defendants will accrue in complying with the statute's requirements include, for example, paper, postage, and printing costs, hardware and software development and maintenance costs, and costs associated with staffing and operation of the phone banks. *See* Mem. of P. & A. in Supp. of Pltfs.' Mot. for Summ. J. and Permanent Inj. Relief ("Pltfs.' MSJ"), filed Sept. 20, 2002, at 15–19.

Plaintiffs further maintain that the statute imposes significant non-monetary burdens on national banks. For example, some smaller federal institutions have stated their intention to exit the California credit card market entirely should the statute be implemented. *See* Hamby

---

6. Prof. Staten bases his figures on data provided to him for the following six large credit card issuers: Chase Manhattan Bank USA, N.A.; Citibank (South Dakota), N.A.; First USA Bank, N.A.; Household Bank (SB), N.A.; MBNA America Bank, N.A.; and Fleet Bank (R.I.), N.A. Staten Decl. No. 4 at ¶ 3. Prof. Staten did not review the figures provided to him prior to conducting his computations. *Id.*

Decl., filed Sept. 20, 2002, at ¶ 7; Youngs Decl., filed Sept. 20, 2002, at ¶¶ 7–8. In addition, plaintiffs have introduced some evidence that the required Minimum Payment Warning is misleading to consumers. *See* Ward Decl., filed Sept. 20, 2002, at ¶ 9–11. Finally, plaintiffs submit that section 1748.13's requirements regarding counseling procedures interfere with national banks' business experience with the propriety and timing of such counseling measures. *See* Hill Decl., filed Sept. 20, 2002, at ¶ 9; Kietz Decl. No. 1, filed May 31, 2002, at ¶ 20; Weber Decl. No. 1, filed May 31, 2002, at ¶ 19.

In contrast, defendants maintain that costs associated with implementation of and compliance with the statute are not burdensome. For example, defendants assert that plaintiffs already have special operating procedures in place that would enable them to vary the format of monthly statements to provide certain information only to particular customers. *See* Decl., filed under seal pursuant to protective order Oct. 25, 2002, at Exs. 6, 8. Similarly, defendants allege that programs already exist which would allow plaintiffs to track payment patterns of customers without significant expense. *Id.* at Exs. 13–16. Further, defendants assert that plaintiffs already operate staffed phone banks similar to those required by the statute. *Id.* at Exs. 17, 19, 21, 22, 24. In addition, defendants assert that training expenses and start-up costs will not be significant. *Id.* at Ex. 4. Finally, defendants maintain that ongoing costs of compliance will amount to a very small percentage of plaintiffs' gross profits.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action on May 24, 2002, seeking to enjoin the commencement and enforcement of section 1748.13 on the following grounds: (1) under the Supremacy Clause, the statute is preempted by the National Bank Act of 1864 ("NBA"), 12 U.S.C. §§ 21 *et seq.*, and the Federal Credit Union Act ("FCUA"), 12 U.S.C. §§ 1751 *et seq.;* (2) the statute violates the dormant commerce clause; and (3) the statute violates 42 U.S.C. § 1983 because it violates either the NBA, the FCUA or the Constitution. Compl., filed May 24, 2002, ¶¶ 3, 10.

Plaintiffs first sought a preliminary injunction against enforcement of section 1748.13 by their motion filed May 31, 2002. Mem. of P. & A. in Supp. of Pltfs.' Appl. for Prelim. Inj. ("Pltfs.' Appl. for PI"), filed May 31, 2002. The court heard oral argument on June 28, 2002 and issued an order finding the record at that time insufficient to render a decision as to the issuance of a preliminary injunction. Mem. & Order, filed June 28, 2002, at 11. Accordingly, the court continued the hearing on the motion and permitted the parties to conduct limited discovery until August 30, 2002, and to thereafter file supplemental briefs. The parties were further directed to answer certain questions in their supplemental briefs on matters of interest to the court. *See* Order, filed July 5, 2002. Enactment of the statute was enjoined pending the continued hearing on the motion. Mem. & Order, filed June 28, 2002, at 2.

Plaintiffs filed their supplemental brief along with their motion for summary judgment on September 20, 2002. Defendants opposed both motions in one brief filed October 25, 2002, and plaintiffs filed a reply brief on November 15, 2002. Plaintiffs base their motion for summary judgment on the grounds that section 1748.13 is wholly preempted by the NBA, the FCUA, the Home Owners' Loan Act

("HOLA"),[7] and the Supremacy Clause. Plaintiffs maintain that there is no genuine issue of material fact regarding the preemption analysis, and that therefore they are entitled to judgment as a matter of law, as well as a permanent injunction barring enforcement of the statute against all federally chartered credit card issuers.

## STANDARD [8]

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the moving party does not bear the burden of proof at trial, he or she may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party

resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. Fed. R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 57 (2d Cir. 1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

## ANALYSIS

### 1. General Preemption Principles

■ Federal preemption of state law may occur expressly, by implication, or by actual conflict with federal law. Express preemption occurs when Congress states in explicit terms its intent to preempt state law. *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Preemption by implication, or

---

**7.** While defendants do not dispute the appropriateness of plaintiffs' HOLA preemption argument in their motion for summary judgment, the court notes that plaintiffs' complaint does not include a claim for relief based on preemption by HOLA. *See* Compl., filed May 24, 2002, ¶¶ 3, 10.

**8.** Because the court's decision on plaintiffs' motion for summary judgment moots plaintiffs' motion for a preliminary injunction, the court does not recite the applicable standard herein.

"field preemption," occurs when federal regulation in a particular area is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). Finally, conflict preemption[9] exists when there is an actual conflict between state and federal law. *See Fidelity Federal Savings & Loan Assoc. v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

■ The Supreme Court has described the applicable inquiry in assessing whether a conflict exists between state and federal law in a numbers of manners. *See Barnett Bank of Marion County v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). For example, actual conflict arises when simultaneous compliance with state and federal law is a "physical impossibility," or when state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir.2002) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). In addition, in some instances, federal and state law can be in "irreconcilable conflict." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982). Further, a state law is preempted when it "frustrates the purpose of [ ] national legislation, or impairs the efficiencies of [ ] agencies of the federal government to discharge the[ir] duties." *McClellan v. Chipman*, 164 U.S. 347, 357, 17 S.Ct. 85, 41 L.Ed. 461 (1896). Alternatively, "[s]tate regula-

tion of banking is permissible when it 'does not prevent or significantly interfere with the national bank's exercise of its powers.' " *Bank of America*, 309 F.3d at 558–59 (quoting *Barnett Bank*, 517 U.S. at 33, 116 S.Ct. 1103).

■ States are not without any authority to impose regulations upon national banks. They do "retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law." *Bank of America*, 309 F.3d at 559 (citing cases). However, because there is a " 'history of significant federal presence' in national banking, the presumption against preemption of state law is inapplicable." *Id.* (citing *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000)).

**2. Truth in Lending Act**

■ Defendants argue that it was Congress's intent that the federal Truth in Lending Act ("TILA"), rather than the NBA, HOLA, or FCUA determine whether states' credit card disclosure laws are preempted by federal law. *See* Notice of Errata and Mem. of P. & A. in Opp'n to Pltfs.' Appl. for Prelim. Inj. ("Defs.' Opp'n to PI"), filed June 19, 2002, at 11–12; Defs.' Opp'n to MSJ at 14. TILA was enacted to "protect the consumer against inaccurate and unfair credit billing and credit card practices," and to provide for the "meaningful disclosure of credit terms." 15 U.S.C. § 1601(a). TILA grants the Board of Governors of the Federal Reserve System power to prescribe regulations and carry out the purposes of the Act. *See* 15 U.S.C. § 1604(a).

---

**9.** Conflict preemption is sometimes treated as a type of implied preemption. *See Geier*, 529 U.S. at 884, 120 S.Ct. 1913.

Defendants point out that TILA does not preempt state laws regarding credit transaction disclosures "except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency." 15 U.S.C. § 1610(a)(1). Defendants maintain that "[b]ecause TILA governs credit card disclosures in detail and applies to banks as creditors, Congress intended it to occupy the entire field of consumer disclosures." Defs.' Opp'n to PI at 13.

Defendants identify TILA's "savings clause" as evidence that state laws governing disclosures are not preempted unless they conflict with federal law. TILA's savings clause provides:

> Except as provided in subsection (e) of this section,[10] this part and parts B and C *of this subchapter* do not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent *with the provisions of this subchapter* and then only to the extent of the inconsistency.

15 U.S.C. § 1610(a)(1) (emphasis added). Thus, the express language of the savings clause indicates that its anti-preemptive effect is limited to TILA. The text provides no indication that the savings clause reaches beyond TILA to control the preemption analysis applicable under any other federal laws, including the federal banking laws.

The Ninth Circuit reached a similar conclusion in its recent opinion in *Bank of America*. In *Bank of America*, the court addressed the scope of the Electronic Fund Transfer Act's ("EFTA") savings clause, which bears a striking similarity to TILA's. 309 F.3d at 565. The EFTA's savings clause provides in part:

> *This subchapter* does not annul, alter, or affect the laws of any State relating to electronic fund transfers, except to the extent that those laws are inconsistent *with the provisions of this subchapter*, and then only to the extent of the inconsistency.

15 U.S.C. § 1693q (emphasis added). The Ninth Circuit stated that "the plain language of § 1693q indicates that it is limited to the EFTA. Section 1693q's reference to 'this subchapter' indicates that the EFTA's anti-preemption provision does not apply to other statutes." 309 F.3d at 565. The court further concluded that "[b]ecause the EFTA's anti-preemption provision is limited to the EFTA, it does not save the Ordinances against preemption by the HOLA and the National Bank Act." *Id.*

In light of the Ninth Circuit's findings in *Bank of America* regarding a substantially similar savings clause under the EFTA, the court finds that TILA's savings clause does not save section 1748.13 from preemption by other federal banking laws such as the HOLA, NBA, and FCUA.

## 3. Home Owners' Loan Act

■ The Home Owners' Loan Act of 1933 ("HOLA") "was enacted to restore the public's confidence in savings and loan associations at a time when 40% of home loans were in default." *Bank of America*, 309 F.3d at 559. The enactment of HOLA was due in part to Congress's dissatisfaction with the manner in which states were conducting the regulation of home financing. *See Conference of Fed. Sav. & Loan Ass'ns v. Stein*, 604 F.2d 1256, 1257 (9th Cir.1979), *aff'd*, 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980).

---

**10.** Subsection (e) refers to credit and charge card application and solicitation disclosure provisions, and has no bearing on the analysis here.

The Office of Thrift Supervision ("OTS") is charged with responsibility for the administration and enforcement of HOLA. 12 C.F.R. § 500.1(a). Pursuant to HOLA, the OTS has the power, "under such regulations as [it] may prescribe—[ ] to provide for the organization, incorporation, examination, operation, and regulation of ... Federal savings associations ...." 12 U.S.C. § 1464(a). The OTS has broad discretion to promulgate regulations that are "appropriate to carry out [its] responsibilities." 12 U.S.C. § 1463(a)(2).

The Supreme Court has stated that "[f]ederal regulations have no less preemptive effect than federal statutes." *See de la Cuesta*, 458 U.S. at 153, 102 S.Ct. 3014. In addition, the Court has specifically noted that OTS regulations govern the " 'powers and operations of every federal savings and loan association from its cradle to its corporate grave.' " *Id.* at 145, 102 S.Ct. 3014 (quoting *People v. Coast Fed. Sav. & Loan Ass'n*, 98 F.Supp. 311, 316 (S.D.Cal.1951)). The Ninth Circuit has further recognized that OTS regulation of federal savings associations is "so pervasive as to leave no room for state regulatory control." *Stein*, 604 F.2d at 1260; *Bank of America*, 309 F.3d at 558.

The OTS regulations themselves expressly declare they are "preemptive of any state law purporting to address the subject of the operations of a Federal savings association." 12 C.F.R. § 545.2. The regulations further specify that the OTS governs the lending-related practices of federal savings associations:

OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities.

12 C.F.R. § 560.2(a).

Importantly, the regulations provide a list of "illustrative examples" which set out "the types of state laws preempted by paragraph (a) of this section." 12 C.F.R. § 560.2(b). Included in the list of preempted state laws are those that govern the terms of credit, such as adjustments to interest rates, balances, and payments due. 12 C.F.R. § 560.2(b)(4). Additionally preempted are those state laws that concern "[d]isclosure and advertising, including laws requiring specific statements, information, or other content to be included in ... billing statements ... or other credit-related documents ...." 12 C.F.R. § 560.2(b)(9).

In *Bank of America*, the Ninth Circuit found that a conflict existed where OTS regulations authorized federal savings associations to use "electronic means or facilities to perform any function, or provide any product or service" while certain municipal ordinances prohibited financial institutions from charging ATM fees to non-depositors. 309 F.3d at 556, 560–61. The court noted that OTS regulations occupied the field of operations, deposit, and lending practices of federal savings banks. *Id.* at 560. The court further held that HOLA and OTS regulations preempted conflicting state limitations on the authority of federal savings associations to collect fees relating to electronic services. *Id.* at 560–61.

Similarly, the OTS regulations at issue here conflict with the requirements of section 1748.13. For example, section 1748.13(c)(1) requires that credit card issuers charge at least a 10% minimum payment of a cardholder's outstanding balance in order to escape the statute's requirements. Cal. Civ.Code § 1748.13(c)(1). Al-

though defendants argue that this provision does not impose a "requirement" but rather provides an "option" for those banking institutions that seek to avoid the requirements of section 1748.13, the statute nevertheless functions to coerce savings and loan associations to adopt the State's rules regarding payment requirements in direct contravention of OTS regulation 560.2(b)(4).

Further, section 1748.13's disclosure requirements conflict with OTS regulation 560.2(b)(9). Under section 560.2(b)(9), state laws regarding disclosure, including those requiring specific statements or information in billing statements, are preempted. 12 C.F.R. § 560.2(b)(9). As described above, section 1748.13 requires that a number of specific disclosure statements be included in a credit cardholder's billing statement. For example, the Minimum Payment Warning clause must be included in all billing statements. Cal. Civ.Code § 1748.13(a)(1). In addition, every statement must also include some type of disclosure identifying the ultimate cost and length of time it would take to pay off a balance by remitting only the minimum payment each billing period. While the card issuer retains some choice over whether, for example, it will opt to include a generic or individualized statement of the time and cost of repayment, it nevertheless must include one of the statements described in the statute. Because section 1748.13's disclosure requirements mandate that specific information be included in cardholders' billing statements, it directly conflicts with OTS regulation 560.2(b)(9).

Defendants and *amicus curiae* Consumers Union urge that the express declaration of preemptive effect by the federal regulators should be ignored. As such, the OTS declarations of preemptive effect are not "substantive," but rather are self-serving claims of federal authority in the form of "placeholder regulations" which exceed the power of the OTS, and are therefore void. The court concurs that, absent congressional grant, the arrogation of preemptive authority by regulatory fiat is not entitled to judicial deference. Here, however, the courts have recognized the congressional grant of broad power to the OTS in the area of regulatory control of federal savings and loan associations. As stated above, the Supreme Court has recognized that the OTS regulations govern "the powers and operations of every Federal savings and loan association from its cradle to its corporate grave." *de la Cuesta*, 458 U.S. at 145, 102 S.Ct. 3014. The Ninth Circuit has further recognized that OTS regulation of federal savings associations is "so pervasive as to leave no room for state regulatory control." *Stein*, 604 F.2d at 1260; *Bank of America*, 309 F.3d at 558. In addition, in *Bank of America*, the Ninth Circuit found that OTS regulations occupy the field of operations as well as deposit and lending-related practices of federal savings banks:

> The Ordinances purport to regulate the operations, and the deposit and lending-related practices of federal savings banks. *However, OTS regulations occupy these fields. See* 12 C.F.R. § 545.2 (asserting field preemption of operations of federal associations); 12 C.F.R. § 557.11(b) (asserting field preemption of deposit-related practices of federal associations); 12 C.F.R. § 560.2(a) (asserting field preemption of lending-related practices of federal associations).

*Bank of America*, 309 F.3d at 560 (emphasis added). In light of the Ninth Circuit's holdings regarding section 560.2 as well as other similar OTS regulations, the court finds that such regulations do not exceed

the scope of OTS's authority.[11]

Thus, section 1748.13 is in obvious conflict with OTS Regulation 560.2, which provides that state laws governing terms of credit and requiring specific disclosures in billing statements are preempted. Accordingly, the court holds that section 1748.13 in its entirety is preempted by HOLA and its accompanying OTS regulations which occupy the field of lending-related practices of federal savings associations.

### 4. National Bank Act

 The NBA was enacted to establish a national banking system free from intrusive state regulation. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314–15, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978); *See Bank of America*, 309 F.3d at 561. Case law reflects that "[t]he supremacy of the federal government in regulating national banks has long been recognized." *Bank of America*, 309 F.3d at 561 (citing cases).

The NBA bestows upon national banks the authority:

> To exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits ... by loaning money on personal security ....

12 U.S.C. § 24 (Seventh). National bank's incidental powers under the NBA "include activities that are 'convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act.' " *Bank of America*, 309 F.3d at 562 (citing *M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1382 (9th Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978)).

In furtherance of the NBA's goal of establishing a national banking system:

> [T]he Supreme Court has "interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily preempting, contrary state law." *Barnett Bank*, 517 U.S. at 32, 116 S.Ct. 1103 (citations omitted). Therefore, in determining the preemptive scope of federal statutes and regulations granting a power to national banks, the Supreme Court has adopted the view that "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Id.* at 33, 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237.

*Bank of America*, 309 F.3d at 561.

Consistent with general principles of preemption, "[s]tate attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties." *Id.* (citing *First Nat'l Bank v. California*, 262 U.S. 366, 369, 43 S.Ct. 602, 67 L.Ed. 1030 (1923)). Alternatively, "[s]tate regulation of bank-

---

**11.** It is also noteworthy that a California Court of Appeal has recently found that the OTS did not exceed its authority in promulgating 12 C.F.R. section 560.2. *See Wash. Mut. Bank v. Superior Court*, 95 Cal.App. 4th 606, 616–19, 115 Cal.Rptr.2d 765 (2002) (reciting history of adoption of section and stating that "[a]t the time Section 560.2 was issued, OTS advised that this 'general lending preemption provision,' was simply restating 'long-standing preemption principles applicable to federal savings associations, as reflected in earlier regulations, court cases, and numerous legal opinions issued by OTS and the Federal Home Loan Bank Board (FHLBB), OTS's predecessor agency.' ").

ing is permissible when it 'does not prevent or significantly interfere with the national bank's exercise of its powers.' " *Bank of America,* 309 F.3d at 558–59 (quoting *Barnett Bank,* 517 U.S. at 33, 116 S.Ct. 1103).

## A. Office of the Comptroller of the Currency

As is the case with the OTS under the HOLA, the Office of the Comptroller of the Currency ("OCC") is responsible for administration of the NBA. *See* 12 U.S.C §§ 1, 26–27, 481. The Supreme Court has stated the following general principle regarding agency constructions of regulatory statutes:

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

*NationsBank of North Carolina v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256–57, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (internal citations and quotation marks omitted).

■ In *Bank of America,* the Ninth Circuit applied this principle to the OCC's interpretation of national banks' incidental powers under the NBA, finding that so long as the OCC's position is reasonable, it is entitled to "great weight." 309 F.3d at 563. The *Bank of America* court was presented with two interpretive letters issued by the OCC addressing the statute at issue before the court as well as its *amicus*

brief. *Id.* It found the opinion letters to be persuasive and consistent with the NBA and OCC regulations, and thus concluded that they were at least "entitled to respect." *Id.* Further, it found that the *amicus* brief was not unworthy of deference. *Id.* In making that finding, the court cited *Auer v. Robbins,* in which the Supreme Court found that an *amicus* brief is not unworthy of deference so long as there is "no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997).

Here, as in *Bank of America,* the OCC proffered two opinion letters and filed an *amicus* brief.[12]

### (1) *Amicus* Brief

In its *amicus* brief the OCC sets forth in detail the agency's position that the NBA preempts section 1748.13 in its entirety. *See* Mem. *Amicus Curiae* of the Office of the Comptroller of the Currency in Supp. of National Bank Pltfs.' Appl. for Prelim. Inj. ("OCC *Amicus* Brief"), filed June 12, 2002; Suppl. Mem. *Amicus Curiae* of the Office of the Comptroller of the Currency in Supp. of National Bank Pltfs.' Mots. for Inj. Relief and Summ. J. ("Suppl. OCC *Amicus* Brief"), filed Sept. 20, 2002. As an introductory matter, the OCC offers the following interpretation of national banks' general powers under the NBA:

> A necessary aspect of [a national bank's] lending operations is the ability to communicate with customers about repayments and to monitor delinquencies. Bank management is accountable to the OCC, as well as to the marketplace, for ensuring the efficient bank operation

---

12. While the opinion letters do not specifically address the statute at issue in this case, plaintiffs cite them as examples of far less onerous state laws than section 1748.13 that the OCC concluded were preempted. *See* Pltfs.' MSJ at 23.

that is fundamental to bank safety and soundness. Thus, the terms and conditions of extensions of credit, and the lender's management of credit accounts, are at the heart of the National Bank Act power to lend money. OCC *Amicus* Brief at 9.

As to section 1748.13, the OCC interprets the statute as presenting banks with the option of implementing one of four alternative requirements:

(1) Charging no interest on the account balance in order to take advantage of the exemption under section 1748.13(c)(2);

(2) Requiring a minimum payment of 10% of the account balance in each billing cycle in order to take advantage of the exemption under section 1748.13(c)(1);

(3) Providing (i) the basic warning, (ii) three generic examples, and (iii) the phone bank capable of dispensing custom payment estimates;[13] or

(4) Providing (i) the basic warning, (ii) three custom estimates, and (iii) referrals to credit counseling services.

*See* OCC *Amicus* Brief at 13.

The OCC concludes that the first option is preempted because 12 U.S.C. section 85 governs the interest rates national banks may charge, and permits them to "charge interest with respect to state law or the Federal Reserve discount rate plus 1 percent, whichever is higher." *Id.* at 14. The OCC finds the second option preempted because it "would encroach directly upon the national bank power to determine the terms and conditions of offers of credit."[14] *Id.* Further, the third option is preempted because the required disclosures are both significant in length and intrude on the highly valued space on the front page of the statement, and additionally, the phone bank requirements are costly and burdensome.[15] *Id.* at 15–18. Finally, the fourth option is preempted because the customized estimates impose "significant costs on national bank lending," and "provide consumers with necessarily inaccurate projections." *Id.* at 18.

The court finds the OCC's interpretation of the preemptive effect of the NBA on section 1748.13 to be reasonable. There is no indication in the OCC's *amicus* brief that its opinion as contained therein "does not reflect the agency's fair and considered judgment on the matter in question." *Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). The brief compares federal law with the requirements of section 1748.13, and comes to reasonable conclusions on questions of preemption. Thus, under *Bank of America,* the OCC's reasonable position regarding preemption issues in its *amicus* brief is

---

**13.** This option would not be available for those cardholders who make only the minimum payment for six consecutive months. *See* Cal. Civ.Code § 1748.13(a)(2)(B).

**14.** The OCC further points to evidence submitted by plaintiffs that one credit card issuer has provided notice to its cardholders that it will require a minimum 10% payment as of the effective date of section 1748.13. *See* Dugan Decl., filed May 31, 2002; *see also* Comstock Decl., filed May 31, 2002, at Ex. A.

**15.** The OCC additionally points to a conflict between an OCC regulation and section 1748.13 that is not otherwise addressed by the parties, but merits mentioning here. 12 C.F.R. section 7.3000 provides that "[a] national bank's board of directors should review its banking hours, and independently of any other bank, take appropriate action to establish a schedule of banking hours." The OCC concludes that because federal law grants national banks' boards of directors the power to determine banking hours, states are powerless to override those decisions. Thus, this section presents a conflict with the phone bank's hour requirements.

entitled to "great weight" in the NBA analysis.

### (2) Opinion Letter

The OCC cites an opinion letter which addressed a West Virginia law governing the sale of insurance (the "West Virginia opinion letter"). Preemption Opinion, 66 Fed.Reg. 51,502 (Oct. 9, 2001).[16] The OCC found that some of the law's requirements were preempted by the Gramm–Leach–Bliley Act ("GLBA").[17] For example, the OCC found that certain disclosures which were subject to "manner and timing" requirements were preempted because they would "increase a bank's operating costs and substantively hamper the bank's marketing activities." *Id.* at 51,507–08. It also found that requiring oral disclosures "places additional burdens on banks to train personnel and to develop procedures to ensure compliance with this requirement." *Id.* at 51,508. Further, it found the costs of compliance to be "especially troublesome for small banks," which "need to keep costs down to offer a full array of products and services in the communities they serve." *Id.*

However, the OCC also found that certain provisions of the law were not preempted. For example, the OCC addressed one section that required transactions involving the extension of credit and insurance sales to be completed independently and through separate documents when insurance is required as a condition of the loan. *Id.* at 51,507. The OCC concluded that this requirement, which imposed "an additional paperwork burden and associated administrative costs on banks," "would not appear to substantially affect the underlying insurance activities." *Id.*

The OCC's reasoning in the West Virginia opinion letter is applicable to a number of the requirements set out in section 1748.13. For example, section 1748.13's disclosure requirements will take up numerous lines of space on cardholders' billing statements, which may result in additional paper and postage costs. More importantly, costs associated with operation of the phone banks required under the statute are estimated to be approximately $684,642.50 per month. Staten Decl. No. 4 at ¶ 5. Undoubtedly, this constitutes a significant burden that would require additional costs in the form of training personnel, staffing the phone banks, and developing compliance procedures. Finally, plaintiffs have submitted the declarations of numerous smaller federally chartered lenders expressing concerns over the burdens associated with compliance with the statute. Some of these lenders have even represented their intentions to exit the California credit card market due to the burdensome nature of compliance. OCC argues that many of these "burdens" imposed on plaintiffs by section 1748.13 are in some

---

16. A second opinion letter cited by plaintiffs addresses an Ohio law requiring that banks resell leased vehicles only through licensed used car dealers. Preemption Opinion, 66 Fed.Reg. 23,977 (May 10, 2001). The OCC found that the law was preempted in part because it "frustrate[d] [national banks'] ability to operate their leasing businesses in an economically efficient manner." *Id.* at 23,-979. This opinion letter is only minimally helpful to the court insofar as it establishes the OCC's view that national banks have the

power to operate according to their own opinions on economic efficiencies.

17. The GLBA contains a preemption provision imposing the standard generally applicable to any federal preemption analysis: state laws which prevent or significantly interfere with a bank's ability to engage in any activity in which the bank is permitted to engage under federal law (in the West Virginia case, the GLBA) are preempted. *See Barnett Bank,* 517 U.S. at 33, 116 S.Ct. 1103.

respects similar to those the OCC found sufficient to warrant preemption in its West Virginia opinion letter.

However, the letter also reveals that the OCC found portions of the West Virginia law were insufficiently burdensome to warrant preemption. During oral argument the OCC acknowledged that a portion of section 1748.13, if severed, may be similarly characterized and thus viewed as *"de minimus."* Thus, the OCC's opinion letter offers some guidance to the court in assessing the preemptive reach of the OCC's regulations in this case.

### B. NBA Analysis

■ Defendants argue that the NBA analysis should begin with a presumption against preemption in this case. *See* Defs.' Opp'n to PI at 10. More specifically, defendants argue that because section 1748.13 is a consumer protection law, and consumer protection is an area of legislation the states have traditionally occupied, the statute is entitled to a presumption against preemption. *Id.* However, *Bank of America* requires a contrary result. *Bank of America* makes clear that while states are not without any authority to impose regulations upon national banks, the areas in which they are permitted to regulate are typically limited to "contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law." 309 F.3d at 559 (citing cases). Consumer protection is not reflected in the case law as an area in which the states have traditionally been permitted to regulate national banks. Accordingly, under *Bank of America,* "because there has been a 'history of significant federal presence' in national banking, the presumption against preemption of state law is inapplicable." *Id.*

Further, national banks' authority is not normally limited by, but rather ordinarily preempts contrary state law. *Barnett Bank,* 517 U.S. at 32, 34, 116 S.Ct. 1103 ("[W]here Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies."). The express power of the NBA at issue here is that of "loaning money on personal security." 12 U.S.C. § 24 (Seventh). There is no indication in the NBA that Congress intended to subject that power to local restriction. *See Barnett Bank,* 517 U.S. at 34–35, 116 S.Ct. 1103. Therefore, the court proceeds with the understanding that the ordinary rule is one of preemption of contrary state law.

In order to survive preemption, section 1748.13 must not prevent or significantly interfere with national banks' powers under the NBA. *See Barnett Bank,* 517 U.S. at 33, 116 S.Ct. 1103. National banks' powers include those that are incidental, or those that are "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." *M & M Leasing Corp.,* 563 F.2d at 1382. Plaintiffs maintain that section 1748.13 interferes with the federal power to lend money through its imposition of costly operational and administrative burdens on national banks' lending activities. Pltfs.' MSJ at 15. Plaintiffs have submitted evidence that compliance with section 1748.13 will impose significant monetary and non-monetary costs on national banking institutions. Those costs may be roughly categorized as follows:

(1) Paper and postage costs. *See* Christie Decl., filed May 31, 2002, at ¶ 17; Fimby–Dukart Decl., filed May 31, 2002, at ¶ 10; Morrison Decl., filed May 31, 2002, at ¶ 8; Stork Decl., filed May 31, 2002, at ¶ 11; Staten Decl. No. 4 at ¶ 5.

(2) Reduced profits (through increased delinquencies) due to displacement of front-page billing information. *See* Fimby–Dukart Decl. at ¶ 6; Hill Decl. at ¶ 12; Stork Decl. at ¶ 10.

(3) Reduced profits due to emphasis on potential negative effects of borrowing.

(4) Provision of misinformation to consumers. *See* Ward Decl. at ¶¶ 9–11.[18]

(5) Staffing of phone banks. *See* Staten Decl. No. 4 at ¶ 5.

(6) Exit from California credit card market by smaller banking institutions. *See* Hamby Decl. at ¶¶ 5–7; Youngs Decl. at ¶¶ 7–8.

(7) Coercion to impose 10% minimum monthly payment. *See* Dugan Decl. at ¶¶ 5, 7, Ex. A; Comstock Decl. at Ex. A.

(8) Software and hardware establishment and maintenance costs. *See* Staten Decl. No. 4 at ¶ 5.

(9) Interference with banks' business experience regarding counseling procedures. *See* Hill Decl. at ¶ 9; Kietz Decl. No. 1 at ¶ 20; Weber Decl. No. 1 at ¶ 19.

There is, however, no authority that provides a yardstick for measuring when a state law "significantly interferes with," "impairs the efficiency of," "encroaches on," or "hampers" the exercise of national banks' powers. *See Barnett Bank,* 517 U.S. at 33–34, 116 S.Ct. 1103. However, the threshold of preemption is in some cases remarkably low. For example, in *Franklin National Bank v. New York,* the Supreme Court found that a state statute prohibiting national banks from using the word "saving" or "savings" in advertising their business was preempted by the NBA.

347 U.S. 373, 377–79, 74 S.Ct. 550, 98 L.Ed. 767 (1954). The state law imposed no affirmative requirements on national banks, unlike section 1748.13. Nor were there any costs associated with compliance with the law, again, unlike section 1748.13. Rather, national banks were simply required to abstain from using two words in the advertising context. Nevertheless, the Court found the state law preempted, and concluded that "[h]owever wise or needful New York's policy ... it must give way to the contrary federal policy." *Id.* at 379, 74 S.Ct. 550. Similarly, the court may not consider the State's needfulness of section 1748.13 here, no matter how compelling it finds the State's reasons for enactment of the statute.

The Supreme Court, however, has also found that other burdens are insufficient to warrant preemption. For example, in *Lewis v. Fidelity & Deposit Co. of Maryland,* the state statute at issue was one that required enforcement of a lien under state law. 292 U.S. 559, 54 S.Ct. 848, 78 L.Ed. 1425 (1934). The bank argued that due to this law, it would be unable to sell property it was entitled to because no one would purchase property subject to a lien. *Id.* at 567, 54 S.Ct. 848. The Court recognized that "a national bank is subject to state law unless that law interferes with the purposes of its creation, or destroys its efficiency, or is in conflict with some paramount federal law." *Id.* at 566, 54 S.Ct. 848. Nevertheless, the Court concluded that the state law was not preempted. *Id.* at 567–68, 54 S.Ct. 848.

The above cases and others [19] illustrate that there is no single cognizable standard

---

**18.** Plaintiffs conducted a consumer survey in which they discovered that over 50% of 843 randomly selected cardholders incorrectly understood the Minimum Payment Warning to mean that paying only the minimum would

increase the interest *rate* on their credit cards. *See* Ward Decl. at ¶ 9–11.

**19.** The Supreme Court's opinion in *Barnett Bank* contains a thorough survey of cases finding preemption of state laws by the NBA,

by which state laws are subject to preemption. As a result, understandably, the court should look to the OCC's interpretation of the NBA which, if reasonable, is entitled to "great weight." Here, the OCC states that terms and conditions of extensions of credit as well as management of credit accounts are powers "at the heart of" the NBA authority to lend money. In assessing the various options for compliance with section 1748.13, the OCC found that the burdens imposed under each option, both monetary and non-monetary, are "substantial." In light of the evidence and controlling precedential authority, the OCC's opinion is a reasonable one, and thus the monetary and non-monetary costs identified by plaintiffs constitute a significant interference with national banks' powers under the NBA.

**5. Federal Credit Union Act**

■ The FCUA was enacted to regulate federal credit union activities. The National Credit Union Association ("NCUA") is granted exclusive authority under the FCUA to "regulate the rates, terms of repayment and other conditions of Federal credit union loans and lines of credit (including credit cards) to members." 12 C.F.R. § 701.21(b). The NCUA's regulatory authority "preempts any state law purporting to limit or affect" rates of interest and terms of repayment, including the amount, uniformity, and frequency of payments. *Id.*

However, 12 C.F.R. section 701.21(b)(3) also expressly limits the preemptive effect of NCUA regulations:

> Except as provided by paragraph (b)(1) of this section, it is not the Board's intent to preempt state laws affecting aspects of credit transactions that are primarily regulated by Federal law other than the Federal Credit Union Act, for example, *state laws concerning credit cost disclosure requirements* . . . .

12 C.F.R. § 701.21(b)(3) (emphasis added).[20]

The NCUA has issued an opinion letter concluding that section 1748.13 is preempted by its lending regulation. *See* App. of Miscellaneous Authorities in Supp. of Pltfs.' Mot. for Summ. J. and Perm. Inj. Relief and Pltfs.' Appl. For Prelim. Inj. ("Pltfs.' App."), filed Sept. 20, 2002, at Ex. E. In that opinion letter, the NCUA states:

> The California law at issue *affects the terms of repayment by placing additional burdens* on credit card issuers that do not require minimum monthly payments of at least ten percent. NCUA's longstanding position is that state laws affecting terms of repayment are preempted. 49 Fed.Reg. 30683, 30684 (August 1, 1984).

Pltfs.' App. at Ex. E (emphasis added).

The NCUA asserts that the 10% repayment option "affects the terms of repayment," since federal credit unions must either impose a 10% minimum monthly repayment or be subjected to the onerous requirements of the statute.[21] The NCUA

---

as well as those cases finding no preemption of state law by the NBA. *See Barnett Bank,* 517 U.S. at 32–34, 116 S.Ct. 1103.

**20.** The NCUA has further directed that in cases where other federal laws, such as the federal Truth in Lending Act ("TILA"), establish their own standards for determining preemption of state laws, federal credit unions "should generally look to those standards in

determining preemption issues." 49 Fed. Reg. 30,683, 30,684 (NCUA Aug. 1, 1984).

**21.** Presumably, the NCUA's opinion would also be applicable to section 1748.13(c)(2), which permits credit card issuers to escape the requirements of the statute in billing cycles where they do not impose finance charges. Cal. Civ.Code § 1748.13(c)(2).

regulations establish that the agency does not intend to preempt state laws concerning credit cost disclosure requirements. 12 C.F.R. § 701.21(b)(3). However, section 1748.13 does not simply impose credit cost disclosure requirements, but rather uses credit disclosures and other requirements (e.g. phone banks) as sanctions to coerce lenders into imposing a 10% minimum payment. Thus "disclosures" under section 1748.13 would seem to fall outside the purview of 12 C.F.R. section 701.21(b)(3). Accordingly, the requirements imposed by section 1748.13 appear to conflict with the NCUA's broad power to regulate the rates, terms of repayment, and other conditions of federal credit union loans and lines of credit.

### 6. Severability

The issue of severability presents the remaining question, namely, is there a portion of the statute which properly escapes the preemptive reach of the NBA or the FCUA that can be enforced by the State of California?

### A. NBA

When assessing the NBA's preemptive effect on section 1748.13 in its *amicus* brief, the OCC did not look at each provision of the statute individually. Rather, it based its analysis upon what it saw to be the four "options" available to national banks under the statute. During oral argument, when questioned about a possible severable provision of the statute such as the generic Minimum Payment Warning, the OCC responded that the agency "could not commit itself to an answer" on the question. Reporter's Transcript of Pro-

ceedings ("RT"), Dec. 6, 2002, at 47–49. However, the OCC represented that it considers such a disclosure "salutary," one that imparts information people "should know." RT at 48. The OCC additionally noted that there have been instances where the agency found that a state law that imposed a burden on national banks was not preempted when the burden is *de minimus*, such as discussed in the West Virginia opinion letter above. RT at 49–50; *see* Preemption Opinion, 66 Fed.Reg. at 51,507.

Because the OCC has not issued an opinion letter specifically discussing section 1748.13, and because the OCC's *amicus* brief does not address the preemptive effect of each individual provision of section 1748.13, the court is without a "formal" agency position on the matter. However, taking the West Virginia opinion letter and the OCC's comments during oral argument as a guide, there appears a distinct likelihood the OCC would find that a generic Minimum Payment Warning, if severable, is insufficiently burdensome to warrant preemption.

The Minimum Payment Warning alone would take up only one or two lines of text on the first page of credit cardholders' billing statements. Absent the other disclosure requirements mandated by section 1748.13, this simple warning is unlikely to result in the addition of a page to monthly billing statements. Thus, additional paper, printing, and postage costs will be minimal if not non-existent.[22] Other monetary costs include establishing a system to identify the bills of only California cardholders. Because credit card issuers already have

---

**22.** The illustrative examples required under section 1748.13(a)(2), while perhaps informative to cardholders, nevertheless impose substantial costs on card issuers. Because these statements would take up numerous lines of space on billing statements, plaintiffs' con-

cerns regarding additional paper, printing, and postage costs if these requirements were to be imposed are convincing. Therefore, the court is persuaded that these disclosure requirements impose significant burdens on federally chartered credit card issuers.

systems in place to distinguish between different cardholders, this cost should also be minimal. Finally, there is insufficient evidence that other important billing information would be displaced, thus resulting in increased delinquencies. In short, if credit card issuers were required to include only the Minimum Payment Warning on billing statements, the burdens imposed would be insignificant.

## B. FCUA

A similar analysis regarding the Minimum Payment Warning is applicable to the FCUA. While the NCUA correctly notes in its opinion letter that section 1748.13's statutory scheme imposes significant "additional burdens," the "burden" imposed by the Minimum Payment Warning is unrelated to the "burdens" of repayment, since it is a "credit cost disclosure" expressly *not* preempted by the NCUA's own regulations. *See* 12 C.F.R. § 701.21(b)(3). In the absence of the other requirements of section 1748.13, the Minimum Payment Warning would simply be a "credit cost disclosure requirement," which the NCUA has declared it has no intention to preempt. In addition, a severable Minimum Payment Warning may well be *de minimus* and "salutary," as noted by the OCC.

## C. Enforcement of Section 1748.13

The court has found that HOLA and OTS holistically preempt section 1748.13 in its entirety. The court further finds that the NBA and OCC, and the FCUA and NCUA, preempt the statute with the possible exception of the Minimum Payment Warning. Thus the question presented is whether the Minimum Payment Warning may be severed so that it is enforceable against national banks and federal credit unions but unenforceable against federally chartered savings and loans.

 The court must apply California law when addressing severability of a statute. *See Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). The severability determination requires an assessment of whether the invalid parts of the statute can be severed from the otherwise valid parts without destroying the validity or utility of the remaining provisions. *See Raven v. Deukmejian,* 52 Cal.3d 336, 355–56, 276 Cal.Rptr. 326, 801 P.2d 1077 (1990). More specifically, the invalid provisions must be severable (1) grammatically; (2) functionally; and (3) volitionally. *Gerken v. Fair Political Practices Com.,* 6 Cal.4th 707, 714, 25 Cal. Rptr.2d 449, 863 P.2d 694 (1993).

A provision is grammatically severable where the "valid and invalid parts can be separated by paragraph, sentence, clause, phrase or even single words." *Santa Barbara Sch. Dist. v. Superior Court,* 13 Cal.3d 315, 330, 118 Cal.Rptr. 637, 530 P.2d 605 (1975). A provision is functionally severable "if the remaining provisions can stand on their own, are capable of separate enforcement, can be given effect, or can operate ... independently of the invalid provisions." *League of United Latin American Citizens v. Wilson,* 908 F.Supp. 755, 766 (C.D.Cal.1995) (internal citations and quotation marks omitted). Finally, a provision is volitionally severable where the remainder of the statute "would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute." *Katz v. Children's Hospital of Orange County,* 28 F.3d 1520, 1531 (9th Cir.1994).

 In this instance, section 1748.13 can be grammatically severed to leave standing only subsection (a)(1), the Minimum Payment Warning. The remainder of the statute can be stricken without confusion or uncertainty. The court further finds the statute is functionally severable.

Specifically, the Minimum Payment Warning stands on its own and can be separately enforced against federally chartered banks and credit unions, independent of the statute's invalid portions. However, despite the grammatical and functional severability of the Minimum Payment Warning, the court must also find volitional severability.

Volitional severability is the most important of the three and requires a determination of legislative intent. Here, the legislative record, unfortunately, does not provide a well-lit path to follow. First, the court notes that the statute contains no severability clause, and thus the legislature's intent to save the statute in part if certain provisions were held invalid is not apparent. *See In re Reyes,* 910 F.2d 611, 613 (9th Cir.1990) (noting that absence of severability clause suggests an "intent to have all components 'operate together or not at all' "). This is particularly troublesome in light of extensive authority warning states that federally chartered lenders enjoy broad congressional grants of authority. *See Bank of America,* 309 F.3d at 558–59.

Second, the record includes no public discussion of federal preemption issues. Thus, if only a portion of the statute is applicable to only certain federally chartered credit card issuers, section 1748.13 could not be severed "without rendering the end product a Swiss cheese regulation that would not be capable of 'accomplishing [the statute's] legislative purposes' " as to a substantial number of federally chartered lenders. *City of Auburn v. Qwest Corp.,* 260 F.3d 1160, 1181 (9th Cir.2001).

Finally, a finding of severability only as to federally chartered banks and credit unions is judicially inappropriate. Section 1748.13 refers generally to "credit card issuer[s]" and makes no distinction between different types or categories of is-

suers. However, if the statute is partially preempted only as to certain federally chartered lenders, the court would have to effectively "rewrite" the statute. This the court cannot do. *See Metromedia, Inc. v. City of San Diego,* 32 Cal.3d 180, 187, 185 Cal.Rptr. 260, 649 P.2d 902 (1982) (quoting *Blair v. Pitchess,* 5 Cal.3d 258, 96 Cal. Rptr. 42, 486 P.2d 1242 (1971)) ("This court cannot . . . in the exercise of its power to interpret, rewrite the statute. If this court were to insert in the statute all or any of the . . . qualifying provisions [required to render it constitutional], it would in no sense be interpreting the statute as written, but would be rewriting the statute in accord with the presumed legislative intent. That is a legislative and not a judicial function."). For example, if the court were to sever the balance of the statute to apply the basic warning only to certain lenders, such severability may impose a competitive advantage of one federally chartered lender over another. The result of such mechanical severability would be an intrusion upon the legislative and executive branches of government, both federal and state.

Thus, the court finds that the statute may not be severed to require application of subsection (a)(1) to only national banks and federal credit unions. Accordingly, the court finds the statute is constitutionally inapplicable in its entirety to all federally chartered credit card issuers.

### 7. Scope of Injunctive Relief

▆▆▆ Defendants maintain that the permanent injunction the court issues should only benefit the named plaintiffs in this action. However, because the court finds that the statute is inapplicable to all federally chartered credit card issuers, this holding by its very nature affects the rights of parties beyond the named plaintiffs in this action. This result is consis-

tent with other cases addressing federal preemption of state or local laws, such as *Bank of America,* where the court issued an injunction preventing enforcement of the ordinance at issue without reference to the parties to whom the injunction applied. 309 F.3d at 556. In addition, the Ninth Circuit has recognized that "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit." *Bresgal v. Brock,* 843 F.2d 1163, 1170 (9th Cir.1987). Finally, the practical result of an injunction limited to plaintiffs would be to require federal lenders not a party to this action to bring individual actions for injunctive relief. This would not only result in a waste of judicial resources, but is unnecessary in light of the cases permitting general injunctions in the preemption context.

### CONCLUSION

For the foregoing reasons, the court holds that the HOLA and OTS regulations preempt section 1748.13 in its entirety. The court further holds that the NBA and OCC regulations and the FCUA and NCUA regulations preempt all sections of 1748.13 except subsection (a)(1). Since the court finds that subsection (a)(1) may not be severed to require application of subsection (a)(1) to only national banks and federal credit unions, it holds that section 1748.13 in its entirety is inapplicable to all federally chartered banks and credit unions.

Accordingly, plaintiffs' motion for summary judgment and for a permanent injunction is GRANTED.[23] A permanent injunction shall issue prohibiting defen-

---

23. Because the court grants plaintiffs' motion for summary judgment and for a permanent

dants from enforcing the statute against all federally chartered credit card issuers.

IT IS SO ORDERED.

injunction, plaintiffs' motion for a preliminary injunction is DENIED as moot.